[Civ. No. 22535. First Dist., Div. One. Mar. 31, 1966.]

HARRY M. ELDER, M.D., Plaintiff and Respondent, v. BOARD OF MEDICAL EXAMINERS OF THE STATE OF CALIFORNIA, Defendant and Appellant.

Thomas C. Lynch, Attorney General, and Gerald F. Carreras, Deputy Attorney General, for Defendant and Appellant.

J. W. Ehrlich and Edward F. Dullea for Plaintiff and Respondent.

SIMS, J.—The Board of Medical Examiners of the State of California, hereinafter referred to as "the board," has appealed from a judgment rendered and entered following a hearing on a petition for writ of mandate filed in the superior court by Harry M. Elder, M.D., hereinafter referred to as

"petitioner," to review the decision and order of the board which revoked his license to practice medicine in this state.

The judgment provides that it is ordered, adjudged and decreed "that the ruling of the respondent Board revoking the petitioner's license is an abuse of discretion and it is hereby vacated, annulled and set aside and that this matter is hereby remanded to the State Board of Medical Examiners with the direction that any evidence procured or any information obtained as the result of the illegal search and seizure or by misrepresentation not be received in said hearing." This judgment follows the recitals contained in conclusions of law which were signed and filed the same day. These conclusions in turn are predicated upon findings of fact, if they may be so termed, which read as follows: "IV. It is true that respondent prejudicially abused its discretion in said proceeding upon said accusation of petitioner in that respondent had proceeded without and in excess of its jurisdiction; that respondent has not proceeded in the manner required by law in the institution and conduct of said proceeding upon said accusation of the petitioner; it is further true that petitioner was not afforded a fair trial in the hearing upon said accusation.

"V. It is true that the decision of the respondent Board is contrary to law and is not based on competent legal evidence.

"VI. It is true that respondent Board failed to follow the procedure provided by law and denied petitioner a fair trial. It is further true that the evidence introduced at the hearing was the result of unlawful search and seizure (while petitioner was outside the United States) when the agents of respondent Board arrested the office nurse of petitioner (charging her with unlawfully practicing medicine and she was found not guilty of this charge) and seized all of petitioner's patients' records which are confidential and protected under the laws of the State of California; and it is further true that at the time of the seizure of the patients' records, respondent Board and its agents did not have any search warrant therefor. It is true that the evidence introduced by respondent was the result of the unlawful search and seizure of petitioner's records.

"VII. It is true that the evidence presented by respondent Board was produced and obtained as a result of the unlawful search and seizure of petitioner's records."

The board seeks an affirmance of its order, and contends on this appeal that the evidence at the hearing before the board sustains its decision and order; and that the record fails to

support the findings of the superior court in any of the particulars stated therein. It asserts (1) that no objections were made on the grounds of unlawful search and seizure to the evidence actually admitted and upon which the board predicated its decision; (2) that insofar as there is evidence in these proceedings which reflects a seizure of other excluded evidence, it fails to show that that seizure was unlawful; (3) that none of the evidence allegedly unlawfully seized was admitted into evidence in these proceedings or used to support the board's decision; and (4) that, in any event, if there was any unlawfully seized evidence admitted it was not prejudicial because the other evidence of petitioner's guilt was overwhelming. Finally, the board asserts (5) that the rule which precludes the use of unlawfully seized evidence in a criminal proceeding does not apply to an administrative proceeding for the revocation of a license.

The board fails to meet the full thrust of the trial court's findings which is not that the evidence introduced was itself unlawfully seized as the result of an unlawful search, but that it was the fruit of, and was produced and obtained as the result of an unlawful search and seizure of petitioner's records. Petitioner in support of the trial court's judgment has refused to accept the board's challenge to point out the particulars in which his rights were violated or the specific evidence which resulted therefrom. He has contented himself with a general statement of constitutional principles to establish that his license cannot be revoked without due process of law, that the use of records obtained by an illegal search and seizure would be a violation of his rights, and that in any event mere evidence cannot be seized in connection with an arrest.

In order to untangle this skein of disparate approaches to the fundamental question at issue: the validity of the decision and order of the board (Code Civ. Proc., § 1094.5; and Gov. Code, § 11523), the patient reviewer must start with the accusation filed against petitioner and unravel the circumstances as they are reflected by the record.

The accusation dated May 6, 1963, charges in a first cause of action that between the approximate dates of March 1, 1960, and August 3, 1962, petitioner prescribed Methedrine ampules[1] for 100 named individuals in violation of sections

---

[1]That Methedrine is a dangerous drug as defined by section 4211 and mentioned in section 2390 of the Business and Professions Code is not

2391[2] and 2391.5[3] of the Business and Professions Code and section 11391[4] of the Health and Safety Code. In a second cause of action it is charged that between the approximate dates of August 4 and August 23, 1962, petitioner prescribed Methedrine ampules for 72 named individuals in violation of the provisions of law mentioned above, and also in violation of section 2399.5 of the Business and Professions Code.[5] A final cause of action alleged that between June 1, 1960, and July 9, 1962, petitioner prescribed Percodan and Empirin Compound with Codeine[6] for three named individuals in violation of the section of the Business and Professions Code first mentioned and of sections 11162.5, 11164, 11168 and 11391 of the Health and Safety Code.[7]

The accusation further points out that the alleged conduct of petitioner in each cause of action constituted grounds for

questioned. (See *Randle* v. *California State Board of Pharmacy* (1966) 240 Cal.App.2d 254, 256-257 [49 Cal.Rptr. 485]; and *People* v. *Brotherton* (1966) 239 Cal.App.2d 195, 205, fn. 4 [48 Cal.Rptr. 513].)

[2]Business and Professions Code section 2391 provides in part: ''Unless otherwise provided by this section, the prescribing, selling, furnishing, giving away or administering or offering to prescribe, sell, furnish, give away or administer any of the drugs or compounds mentioned in section 2390 to a habitue or addict constitutes unprofessional conduct within the meaning of this chapter. [There follow exceptions not pertinent herein.]''

[3]Business and Professions Code section 2391.5 provides: ''The violation of any of the statutes of this State regulating narcotics and dangerous drugs, constitutes unprofessional conduct within the meaning of this chapter.''

[4]Health and Safety Code section 11391 provides in part: ''No person shall treat an addict for addiction except in one of the following: [there follow certain institutions and exceptions not applicable herein].''

[5]Business and Professions Code section 2399.5 provided: ''Prescribing dangerous drugs as defined in Section 4211, without either a prior examination of the patient or medical indication thereof, constitutes unprofessional conduct within the meaning of this chapter.'' The board's decision found that the charge under this section was not established, and it is not of further concern.

[6]Percodan and Empirin Compound with Codeine are admittedly narcotics as defined in sections 11001 and 11002 of the Health and Safety Code and mentioned in section 2390 of the Business and Professions Code.

[7]Health and Safety Code section 11162.5 provides: ''A prescription, in order to be effective in legalizing the possession of unstamped narcotic drugs and eliminating the necessity for use of order forms, must be issued for legitimate medical purposes. The responsibility for the proper prescribing and dispensing of narcotic drugs is upon the practitioner, but a corresponding liability rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued to an addict or habitual user of narcotics, not in the course of professional treatment but for the purpose of providing the user with narcotics sufficient to keep him comfortable by maintaining his customary use, is not a prescription within the meaning and intent of this division; and the person filling such an order, as well as the person issuing it, may be charged with violation of the law.''

the suspension or revocation of his license under sections 2361 and 2378 of the Business and Professions Code.[8]

On the receipt of the accusation the petitioner filed his notice of defense and request for hearing and the matter was regularly heard on June 18 and 19, 1963. Thereafter, on June 28, 1963, the board made its decision and order in which it found that petitioner was guilty of the charges, with the exception of the alleged violation of section 2399.5 of the Business and Professions Code, and ordered his license revoked for each "of the separate and several violations."

The principal elements of the charges as evidenced from an examination of the sections of law referred to, and as recognized by petitioner at the hearing, are (1) whether petitioner prescribed the alleged drug for any of the individuals concerned, and (2) whether that individual was then an addict. In an attempt to establish these facts the board subpoenaed petitioner's records relating to the individuals for whom he had prescribed Methedrine. According to petitioner's testimony in a prior action, a transcript of which was admitted in the hearing before the board, the records consist of cards entitled, "Patients Financial Record Card" and each is a combination financial record and history and treatment card. The board also subpoenaed the pharmacists who allegedly filled the prescriptions which petitioner allegedly gave to the individuals named in the accusation.

The attorney for the board called as his first witness petitioner's office nurse. She identified two stacks of records then before the court as records of the doctor's "Methedrine patients." These cards she kept separately for "my convenience in filing them, because as far as phone calls from patients and so forth and billing them, I do not send them out a bill every month. They usually either pay cash or I give

---

Section 11164 provides: "No person shall prescribe for or administer, or dispense a narcotic to an addict, or to any person representing himself as such, except as permitted by this division."

Section 11168 provides: "No person shall prescribe, administer, or furnish a narcotic except under the conditions and in the manner provided by this division."

Section 11391, see fn. 4.

[8]Section 2361 provides: "The board shall take action against any holder of a certificate, who is guilty of unprofessional conduct which has been brought to its attention, or whose certificate has been procured by fraud or misrepresentation or issued by mistake."

Section 2378 provides: "The violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of or conspiring to violate any provision or term of this chapter constitutes unprofessional conduct within the meaning of this chapter."

them a statement before they leave the office to send their remittance in . . ." They were differentiated from "regular patients" which included everyone else except the ones for which petitioner prescribed Methedrine. She also maintained the records separately for "O.B." for "O.A.S." patients and for other categories under her own filing system. When the witness was asked what portion of the records she completed, petitioner objected on the ground that that question called for a privileged communication. In argument which extends over 12 pages of the hearing transcript the objection was considered as going to the admission into evidence of the record cards themselves. The attention of the hearing officer was directed to the physician-patient privilege as then found in the provisions of subdivision 4 of section 1881 of the Code of Civil Procedure,[9] to the provisions of section 11513 of the Government Code which declared: "The rules of privilege shall be effective to the same extent that they are now or hereafter may be recognized in civil actions . . .";[10] and to various provisions of the Health and Safety Code and Business and Professions Code which assertedly provide for the keeping and inspection of records.[11] The hearing officer concluded under the law as it then existed (Code Civ. Proc., § 1881, subd. 4; Gov. Code, § 11513; and see *Marlo* v. *State Board of Medical*

[9] Code of Civil Procedure, section 1881 provided in part: "There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person cannot be examined as a witness in the following cases; . . . 4. A licensed physician or surgeon cannot, without the consent of his patient, be examined in a civil action, as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient; [there follow exceptions not applicable here]."

By Statutes 1965, chapter 923, page 2532, section 1, paragraph "4" was amended to include professional assistants of the physician within the scope of those who cannot be examined without the consent of the patient, and by the addition of provisions which make the privilege inapplicable to proceedings such as these. (See also Evid. Code, § 1007; Stats. 1965, ch. 299, art. 6, p. 1331, operative Jan. 1, 1967, and comment, Assembly Committee on Judiciary, Assembly J. April 6, 1965, p. 1749; and cf. comment, §§ 998 and 999, Cal. Law Rev. Comm., Jan. 1965.)

[10] By Statutes 1965, chapter 299, page 1366, section 135, operative January 1, 1967, Government Code section 11513 was amended to provide: "The rules of privilege shall be effective to the extent that they are otherwise required by statute to be recognized at the hearing . . ."

[11] Health and Safety Code, section 11102 (function of division of state Division of Narcotic Enforcement), section 11107 (inspection of records by Board of Pharmacy), sections 11225, 11226 (prescriber's record of narcotic prescription); and see section 11166.10 (prescription book). Business and Professions Code, section 4051 (record of drugs dispensed by physician); and section 4232 (record of sale or disposition of dangerous drugs).

*Examiners* (1952) 112 Cal.App.2d 276, 282 [246 P.2d 69] and *Foster* v. *McConnell* (1958) 162 Cal.App.2d 701, 707 [329 P.2d 32]), that the case histories could not be received in evidence unless the patient waived the privilege.

In an effort to show that the privilege had been waived in part there was offered in support of the accusation a transcript of a hearing before the State Board of Pharmacy containing testimony of petitioner in which he identified 51 "Patients Financial Record Cards" as representing records of patients for whom the pharmacist in question had refilled Methedrine prescriptions during the period from August 4 to August 25, 1962, while the petitioner was away. The cards were received in evidence without objection in those proceedings. The hearing officer refused to admit the transcript, or the record cards, and they were marked for identification only. Thereafter, over petitioner's objection that it was too general, there was read into the record petitioner's prior testimony to the effect that the common factor for the prescription of 20 mg ampules of Methedrine for the patients reflected in the 51 record cards was that they were "mostly either alcoholics or drug addicts, narcotic addicts." However, a second attempt to get in the record cards which had been made a matter of public record in the prior action was unsuccessful.

In the meantime, arrangements had been made to dispense with the presence of the pharmacists. After some equivocation it was finally stipulated as follows: ". . . that if the pharmacists responded to the subpoenas duces tecum issued by the Board of Medical Examiners, that their records would show that Dr. Elder prescribed and they dispensed Methedrine ampules for the persons listed in . . . Schedule A in the accusation and for the persons listed in . . . Schedule B. It is further stipulated that if the pharmacists responded to said subpoenas that their records would show that Dr. Elder prescribed and the pharmacists dispensed Percodan and Empirin Compound with codeine for the persons listed in Schedule C. Nothing in this stipulation shall be construed as admitting the truth of the charging allegations of the accusation, nor shall it be construed as a waiver of the physician-patient relationship."

Examination of petitioner's nurse proceeded along general lines without specific reference to particular patients. On the advice of counsel she refused to answer the following question: "Could you tell us what the patients—the Methedrine patients [which she had separated in her files for convenience] . . . were being treated for?" She testified that they did not have the situation at petitioner's office where patients

would come in and ask for Methedrine by name; that it was not her practice to question the patients as to what the medication was for; that petitioner went to a medical convention in Rio de Janeiro from August 4 to August 23 or 24, 1962, during which period she was in the office; that there were some patients—"60 percent"—"75 to 100"—who received refills of Methedrine prescriptions for sixty 20-mg. ampule Methedrine to be taken once, twice or three times daily during the period for a payment or charge of $7.50 each; that in accordance with instructions from the petitioner when the patient came in for a refill she got out his chart which showed the prescription with the number, the strength of medication and how it was to be used; that if it appeared from the date and dosage of the prior prescription that it was time for a refill she would take the patient's blood pressure, make the refill on the card and give the patient a receipt with the number to take to the pharmacy; that where there was no prescription number presented from the old label the patient would have the pharmacist telephone, and she would check the patient's identity by birthdate and authorize the refill while noting the pharmacy on the chart. Her denial that patients would come in and specify that they wanted Methedrine was impeached by her admission that she made a notation "New Methedrine" on the charts, and her testimony in a board of pharmacy proceeding that patients would come in and so specify.

She testified that she would not know whether any of petitioner's patients were narcotic addicts; that she was never told that some of his patients were narcotic addicts; and that she never told anyone they were narcotic addicts or that they were being treated for addiction and alcoholism. She stated that she had noted abscesses on some of the patients in treatment but did not know the cause. She admitted that she had taken histories including some which revealed past narcotic addiction. Attempts to elicit the names of these patients was forestalled by petitioner's successful assertion of the patient's privilege.

The nurse further testified that on a couple of occasions she had prepared lists of Methedrine patients at petitioner's request so he could check names with enforcement agencies or other doctors; and identified certain lists as comprising part prepared by herself and part received in the mail. She stated that certain entries on the lists were in her handwriting. The hearing officer had the lists marked for identification but refused to admit them in evidence because of petitioner's claim

that the list of patients was privileged.[12] The nurse was then requested to read the notations in her handwriting and was instructed not to answer. She did testify that "no more" indicated no more Methedrine to the individual so noted. After further discussion petitioner's counsel stipulated that the notations which the nurse wrote could be admitted in evidence. She identified her notations and some of petitioner's, and testified in substance that they indicated reasons for refusing further prescriptions to the persons concerned such as getting prescriptions from another doctor, in jail, or selling Methedrine.

The senior special investigator for the Department of Professional and Vocational Standards testified that on August 23, 1963, he went to petitioner's office with an inspector from the State Board of Pharmacy and two officers of the San Francisco police department armed with a warrant for the arrest of petitioner's nurse.[13] At the time of her arrest she was asked where the records were of the patients who had received authorization for Methedrine during the period of the doctor's absence. She indicated some which were loose on top of a desk adjoining hers as part of them and stated that the others were in a metal filing cabinet on a shelf lower down. Over petitioner's objection the investigator testified that he went through the cards that were in the metal filing cabinet designated by the nurse; that he read all of them that related to people who were using Methedrine; that "On many of the record cards was the notation—a similar notation to the effect that Methedrine helps; reduces craving for heroin, or narcotics addiction, Methedrine keeps him from going back to the stuff; last fix two days ago; needs Methedrine to keep of [sic] H; similar other notations."

According to the investigator, on being asked, the nurse stated that the reason petitioner was prescribing Methedrine to all these people was for alcoholism and addiction—drug addiction.

The remaining evidence presented in support of the charge was adduced in support of the contentions that those who were embraced in the stipulation as recipients of prescriptions for the prescribed drugs from petitioner in fact fell within the category of "habitue or addict" as those terms are used in section 2391 of the Business and Professions Code, and that

[12]The propriety of this ruling is not before us. The board in its appeal takes the position that the lists were excluded.

[13]The circumstances of her arrest are hereinafter considered.

petitioner in prescribing for them violated the mandate of section 11391 of the Health and Safety Code which recites: "No person shall treat an addict for addiction except in one of the following: [named institutions and places]."

An inspector of the San Francisco police department, who had been with the narcotics bureau of that department for 14 years, testified that he was familiar with and had arrested narcotic addicts, that he was familiar with the signs that would indicate a person to be a narcotic addict, and that he had discussed narcotic addicts with other officers and checked records concerning them. He identified nine individuals on Schedule A and five individuals on Schedule B as addicts or habitues. He was unable to fix the time of addiction as being within the respective dates charged in the accusation, but stated that they were habitual addicts; that a very small proportion of them changed their habits and those that changed them permanently were buried; that he had known periods of time when given individuals were not using narcotics because they were imprisoned; that he would not classify persons as addicts at a particular time if they were not currently using any narcotics; that the addict is psychologically bound forever, there is always a residual element in his mind that he cannot get rid of. Petitioner's objection to this witness' characterization of the named individuals as addicts on the grounds that it failed to show the time at which such status existed was overruled.

Another inspector with five years' experience in the same bureau testified that as operator of the Nalline Clinic he had administered a test to one individual on Schedule A who had 77 needle stabs in different parts of the arms on April 30, 1961, and that there was a positive reaction which indicated that he was under the influence of a narcotic at that time. He also reported positive tests on two individuals named in Schedule B, of which one was administered a year and one-half prior to the period in question. Petitioner's motion to strike the testimony concerning the latter test was denied.

A narcotic agent with the Bureau of Narcotic Enforcement of the State Department of Justice stated that in his 18 years' experience he had familiarized himself with narcotic addicts, had occasion to arrest them and had discussed them with other officers and reviewed reports about them. He testified that he had separately arrested and secured the conviction of two of the individuals named on Schedule C for a stolen prescription and fictitious address, respectively, in connection with narcotic

medication, within the period set forth in the third charge; and that at the time of his arrest there were indications that each of the individuals was addicted to narcotics. He identified a husband and wife on Schedule B as addicts and users of Methedrine, and stated the wife had but a month before sought and obtained her own commitment for the use of Methedrine as a habit-forming drug. A motion to strike this testimony for lack of time element was denied. Testimony regarding another individual on Schedule A was stricken because of the agent's lack of knowledge of his condition. He further identified two individuals on Schedule A and two on Schedule B as addicts and users, but was unable to fix the time of their addiction between the respective charging dates. This agent further testified that Methedrine was a palliative of first choice to a narcotic addict when heroin was not available; that the wife mentioned above was securing dosages from petitioner and other doctors and only sought commitment when she was cut off of Methedrine; that Methedrine medication was substituting for some of the narcotics; that most of the names on the state records he had known as former heroin addicts during his 18 years' experience; that very few who take Methedrine and stop taking heroin, ultimately stop taking Methedrine; that as far as a cure is concerned, with few exceptions, it is necessary to go out and get [confine] either a heroin or a Methedrine user; and that somewhat better than 90 percent of those who once became addicted to heroin are known recidivists.

A field supervisor of agents for the State Bureau of Narcotic Enforcement, whose qualifications were admitted by petitioner, testified that he knew 17, possibly 19, specific individuals on Schedule A, 5 on Schedule B, and one on Schedule C as narcotic addicts; and that he knew 6 on A, 6 on B, and one on C as users of narcotics. At the request of petitioner he defined his distinction as follows: "In my interpretation of the law anyone who uses narcotics illegally is therefore an addict. However, the individuals who I called addicts are those who use it compellingly and must use it to maintain a normal appearance or feeling of normality."

There was also received in evidence commitment papers for an individual named in Schedule A, who was also otherwise identified as an addict. These papers showed a discharge and certificate of competency as of July 3, 1962. Other documentary evidence reflects a commitment October 10, 1960, for

habit-forming drugs — barbital addiction of an individual named in Schedule A; and a death certificate of another individual on that list showing his death February 27, 1962, due to alkaloid of morphine group.

Over the objection of petitioner, written waivers of privilege were presented for one individual on Schedule A and two on Schedule B. Copies of their record cards were thereupon received in evidence, and the first patient's card reflects in part "Began Demeral Morphine ... main-last fix July 20, 1962 4 demeral tablets one dose gets sick on heroin Habits $30-40 daily ..." A new patient on July 24, 1962, he received a prescription for Methedrine to be taken three times a day. The card for one patient on Schedule B reflects a first visit on May 29, 1962, with a recorded history and symptoms which reflects in part "Heroin a few times Morphine for past year ... none for 4 months Methedrine for 4 months—Methedrine-spin-stops craving for alcohol or narcotics." Methedrine three times daily was prescribed, refilled June 15, July 11, reduced to twice daily August 1, and refilled August 17, during petitioner's absence for three times daily. The other first appeared July 23, 1962, with a history which reflects "Heroin habit at age 16—1958—to Sept. 1961 $10-$15 habit Last fix Sept. 1961. Gets depressed—feels tired Vag. addict—Probation 1 year 1-2 daily Meth. stops craving." Methedrine twice a day was prescribed and was refilled during petitioner's absence on August 22, 1962.

A Contra Costa County deputy sheriff testified that in February 1963, when he made inquiry about a patient listed in Schedule A the nurse advised that "he was under treatment for addiction." The witness could not say whether addiction was for Methedrine or narcotics. An Alameda sheriff's detective was more specific. His telephone inquiry concerning an individual on Schedule A in March 1963 produced a statement from someone representing himself as petitioner that he was treating that individual for narcotics addition and had prescribed Methedrine to be taken by liquid injection because the majority of narcotic addicts have a fetish about using the needle.

A newspaper reporter testified that in the week preceding the hearing before the board he interviewed petitioner at his attorney's office at the latter's request. Petitioner related that he was treating addicts and former addicts with Methedrine; that the first patient had come to him about three years previously after a doctor who had been prescribing Methedrine had

gone out of business for one reason or another; that he some-times finds that these patients need or have been taking very large quantities of Methedrine and he would attempt to step them down and finally get them off the drug altogether if he could; that he would sometimes prescribe as many as 75 to 100 ampules to begin with and later reduce this in the course of a few weeks; that his purpose was to help these people get off of heroin; that he felt he was succeeding in some degree because he had about a dozen patients who were taking neither heroin nor any other narcotic, and who were free, who had stopped taking Methedrine; that although this was a very small number, it compared favorably with conventional treatment in state and federal institutions. Petitioner used the word "ad-dicts" several times and was corrected by one of his attorneys who said, "You mean former addicts" and petitioner replied, "Yes, I mean former addicts." This witness also testified that petitioner had stated at a public hearing before the board of pharmacy examiners that he had between 200 and 300 addicts and former addicts as patients. A copy of the newspaper article written by the witness was also received in evidence as acknowledged hearsay. (See Gov. Code, § 11513, subd. (c).)

Finally a portion of a transcript of another Board of Pharmacy hearing was offered and received. It reflects testi-mony of petitioner as to arrangements made for refilling Methedrine prescriptions in his absence.

At this point petitioner's attorney addressed the board as follows: "One, I want to address myself to a general motion for dismissal. I'll call Your Honor's attention to the fact that Your Honor, over my objections, admitted certain things in evidence, regardless of the question of search and seizure. . . . Your Honor has ruled that my motion to strike the testimony of Mr. Smith on unlawful search and seizure—you denied that . . . and denied it in each instance where I made the motion. I don't have the transcript, so I don't have them all." The same point is found more articulately stated in petitioner's petition for writ of mandate as follows: "all of the evidence introduced at the hearing was the result of unlawful search and seizure when the agents of respondent board arrested the office nurse of petitioner and seized all of his patients' records, which are confidential and protected under the laws of the State of California; that at the time of the seizure of the records, respondent Board and its agents did not have any warrant therefor." Finally, it is expressed in

the findings of fact and conclusions of law of the superior court which were first set forth herein.

### The applicability of the exclusionary rule of the criminal law to the license revocation proceedings is undetermined

The hearing officer ruled that the policy of excluding evidence seized by an unlawful search and seizure (*People* v. *Cahan* (1955) 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513]) did not apply to administrative hearings, at least where there was some right to inspect and investigate the business of a licensee. (See *Cooley* v. *State Board of Funeral Directors & Embalmers* (1956) 141 Cal.App.2d 293, 298 [296 P.2d 588].) The question was postulated but not decided in *Thorp* v. *Department of Alcoholic Beverage Control* (1959) 175 Cal. App.2d 489, 492 [346 P.2d 433]. Since the trial court pronounced judgment the Supreme Court in *People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92 [41 Cal.Rptr. 290, 396 P.2d 706], applied the rule to proceedings for forfeiture of property. The following language appears to bear out the foresight of the trial judge in this case who ruled that it was erroneous for the hearing officer to rule as outlined above. ''The People also contend that, conceding the unlawfulness of the seizure, the exclusionary rule should not be applied in a car-forfeiture case, as the action is civil in nature. Whatever the label which may be attached to the proceeding, it is apparent that the purpose of the forfeiture is deterrent in nature and that there is a close identity to the aims and objectives of criminal law enforcement. On policy the same exclusionary rules should apply to improper state conduct whether the proceeding contemplates the deprivation of one's liberty or property. (See *People* v. *Cahan,* 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513].) '' (62 Cal.2d at pp. 96-97.)

In view of the foregoing it will be assumed herein that the exclusionary rule will apply to an administrative hearing where the proceeding contemplates the deprivation of a license which is recognized as a property right, as is the right to practice medicine. (See *Hewitt* v. *State Board of Medical Examiners* (1906) 148 Cal. 590, 592 [84 P. 39, 113 Am.St.Rep. 315, 7 Ann. Cas. 750, 3 L.R.A. N.S. 896].)

This assumption, however, does not establish the other postulates of the trial court's decision. The record must be examined to determine whether the adoption of an assumed erroneous legal theory by the hearing officer occasioned any

prejudicial error. If there was no unlawful search or seizure, or if no documents so seized were admitted in evidence or were the source of other evidence that was admitted, the findings of the trial court cannot be sustained.

*The record fails to reflect an unlawful search and seizure*

The trial court announced its conclusions as to the legality of the seizure of the records as follows: "I am convinced that the records that they seized at the time—those records at the time they went in and arrested the nurse, it was an illegal search, the fact that they arrested the nurse, and incidental to her arrest, picked up all these records. It is obvious they were looking for the doctor's records. . . . And you have to look at the intent of the parties. So I hold the search illegal, and the question is whether or not there was any evidence other than the illegal evidence upon which . . . the hearing officer could have based his finding."

It may be obvious that they were looking for the doctor's records, but it does not follow that the search was illegal on that account if it was supported by a valid arrest. When the chaff of counsel's declarations is winnowed from the wheat of evidence the following pertinent information is gleaned from the record:

■ The senior special investigator for the State Department of Professional and Vocational Standards, an inspector from the State Board of Pharmacy and two officers of the San Francisco Police Department appeared at petitioner's office on August 23, 1963, with a warrant for the arrest of his nurse and placed her under arrest. The officers did not apply for or have a search warrant although they probably had time to get one.

A search of the record before the board and the pleadings and briefs filed in the superior court in the mandamus action fails to reveal the nature of the charge for which the warrant was issued. The parties and hearing officer appeared to be conversant with the proceedings. When the hearing officer rejected as a mere observation of counsel the latter's statement that the nurse had been tried and found not guilty, he noted that it was a matter of public record anyhow.[14] Support

---

[14]Records of the municipal court in the City and County of San Francisco reflect that a complaint, No. G 48695, was filed therein on August 24, 1962, charging one bearing the initial of the given name and the surname of the nurse with violation of section 2141 of the Business and Professions Code (prescribing without having a certificate so to do) during the period between August 10 and 22, 1962, and that on March 1,

for the parenthetical clause reading "charging her with unlawfully practicing medicine," which is found in the findings of fact, is first discovered in the opening argument of the counsel for petitioner in the mandamus proceeding. In the course of that argument he volunteered that the records in question were involved in the trial of the nurse, and that her prosecution grew out of information revealed by telephone conversations between her and a pharmacist which were overheard and recorded by the authorities with the permission of the latter.

The officers asked the nurse at the time of her arrest where the records were of the patients who had received authorization for Methedrine during the period of petitioner's absence. She indicated some which were loose on top of a desk adjoining hers, said that was part of them and that the others were in a metal filing cabinet on a shelf lower down. According to the nurse, they just came in, arrested her, took the records and a list of Methedrine patients, which she had prepared at petitioner's request, out of the office and monitored off all the conversations. She was very upset and shaken and could not recall the questions addressed to her or her answers.

The investigator testified that on the following day and for some time on a couple of occasions during the following week he had occasion to go through the cards that were contained in the metal filing cabinet; that he initialed most, if not all of the records subsequent to the time they were picked up; and that he read all of them that related to people who were using Methedrine.

From the evidence developed in this case it is obvious that the practice of refilling the prescriptions which was followed in petitioner's absence was of questionable legality. Section 2141 of the Business and Professions Code makes it a misdemeanor to prescribe for an ailment, etc., without having at the time of so doing a valid unrevoked certificate to practice medicine. The provisions of section 4036 of that code, which defines a prescription, do not include a nurse as among those designated to prescribe or write a prescription; and section 4227 prohibits the furnishing of a dangerous drug without a prescription. It is true that section 4229, which then provided, "No prescription for any dangerous drug may be refilled except upon authorization of the prescriber which may be

1963, following trial by the court, the defendant was found not guilty pursuant to the conclusions set forth in a memorandum decision filed that day which reflects that the charges grew out of prescriptions which the nurse authorized to be refilled in petitioner's absence.

given orally or at the time of giving the original prescription" was subject to the construction (which was followed by the municipal court in the action against the nurse) that since petitioner could have originally authorized a refill, and since, if present, he could have orally authorized a refill, it was proper for the nurse to orally authorize a refill pursuant to the instructions given her before his departure. Nevertheless, there was no precedent so construing the statutes, nor does it appear that the authorities knew or had reason to believe that all of the dangerous drugs furnished by authorization of the nurse were for refilled prescriptions. (See *Randle* v. *California State Board of Pharmacy* (1966) 240 Cal.App.2d 254, 258-260 [49 Cal.Rptr. 485].)

On the record, therefore, there is nothing to sustain any implication from the trial court's finding that the filing of the complaint and the issuance and execution of a warrant against the nurse was other than bona fide. The arrest being valid the search attendant thereto was lawful. "Defendant unavailingly argues that here the police officers had ample time to procure a search warrant and therefore such warrant was required in order to validate the search and seizure of the incriminating evidence at the time of his arrest. (*Trupiano* v. *United States*, 334 U.S. 699, 708 [68 S.Ct. 1229, 92 L.Ed. 1663].) In *United States* v. *Rabinowitz*, 339 U.S. 56 [70 S.Ct. 430, 94 L.Ed. 653], it was held that a search of the defendant's premises incident to his lawful arrest at those premises was not unreasonable. In so concluding, the court in the *Rabinowitz* case further said at page 66: 'To the extent that *Trupiano* v. *United States*, 334 U.S. 699 [68 S.Ct. 1229, 92 L.Ed. 1663], requires a search warrant solely upon the basis of the practicability of procuring it rather than upon the reasonableness of the search after a lawful arrest, that case is overruled. The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' " (*People* v. *Winston* (1956) 46 Cal.2d 151, 162-163 [293 P.2d 40]; and see *Ker* v. *California* (1963) 374 U.S. 23, 41 [83 S.Ct. 1623, 10 L.Ed.2d 726] and *People* v. *Chapman* (1962) 207 Cal.App.2d 557, 571 [24 Cal.Rptr. 568]; *Thorp* v. *Department of Alcoholic Beverage Control, supra*, 175 Cal.App.2d 489, 492.)

The instant case differs from *People* v. *Schaumloffel* (1959) 53 Cal.2d 96 [346 P.2d 393] and *Yonchar* v. *Superior Court* (1961) 193 Cal.App.2d 135 [14 Cal.Rptr. 93]. In each of those cases it was recognized that it was proper to take evidence connected with the offense for which the arrest was made, but

a general and exploratory search was made which resulted in the seizure of records not connected with that offense, but which led to other charges. Here the records were designated by the nurse in connection with the charges for which she was arrested. Furthermore, there were other sources from which the names of those to whom prescriptions were issued could be obtained.

Petitioner's contention that it is unlawful to seize his records from his nurse overlooks the undisputed fact that he left her in control of his office and instructed her to use the records in connection with the activities for which she was arrested. ■ There is no constitutional prohibition which precludes using against the principal evidence which has been legally seized from an agent to whom has been entrusted its possession and control. (*Marron* v. *United States* (1927) 275 U.S. 192, 198 [48 S.Ct. 74, 72 L.Ed. 231].)

Petitioner also relies on authorities which suggest that "mere evidence" cannot be the subject of seizure in any event. (*Abel* v. *United States* (1960) 362 U.S. 217, 234 [80 S.Ct. 683, 4 L.Ed.2d 668]; *Harris* v. *United States* (1947) 331 U.S. 145, 154 [67 S.Ct. 1098, 91 L.Ed. 1399]; and *Gouled* v. *United States* (1921) 255 U.S. 298, 309 [41 S.Ct. 261, 65 L.Ed. 467].) The recent case of *People* v. *Thayer* (1965) 63 Cal.2d 635 [47 Cal.Rptr. 780, 408 P.2d 108] reviews the foregoing cases and concludes: "We hold that the mere evidence rule is not a constitutional standard and has no application in California." (63 Cal.2d at p. 642.) ■ The remaining conclusions of the court are also pertinent here: "Even if the mere evidence rule were a constitutional standard, it would not require the exclusion of Dr. Thayer's medical care records, for they were the instruments of crime. The employees testified that they used the records to draw up the fraudulent statements. In some cases Dr. Thayer placed wavy lines on the records to indicate that false billings were to be made. Under the circumstances, these records were more instrumental in the commission of the crime than were the utility bills and ledger in *Marron* v. *United States, supra,* 275 U.S. 192, and the code books in *Abel* v. *United States, supra,* 362 U.S. 217. (See also *Matthews* v. *Correa* (2d Cir. 1943) 135 F.2d 534; *Landau* v. *United States Attorney* (2d Cir. 1946) 82 F.2d 285, cert. den. 298 U.S. 665 [56 S.Ct. 747, 80 L.Ed. 1389].) Finally, it should be noted that there are some opinions that construe *Gouled* v *United States* to protect privacy by preserving private papers, such as a personal diary, from any seizure. (*Davis* v. *United*

*States* (1946) 328 U.S. 582, 595 [66 S.Ct. 1256, 90 L.Ed. 1453] [Frankfurter, J., dissenting] ; *United States* v. *Boyette* (4th Cir. 1961) 299 F.2d 92; *United States* v. *Stern* (D.C.S.D.N.Y. 1964) 225 F.Supp. 187.) This construction is contrary to the opinion of the court in *Gouled,* but even if there is such a rule, it would not prevent the seizure of business files such as the medical records in this case, which were freely open to the doctor's numerous employees. That business records are not constitutionally protected from properly authorized searches and seizures is indicated not only by *Marron* v. *United States, supra,* 275 U.S. 192, and *Zap* v. *United States, supra,* 328 U.S. 624 [66 S.Ct. 1277, 90 L.Ed. 1477], but also by the doctrine that records that are required by law to be kept are not protected by the privilege against self-incrimination. (*Shapiro* v. *United States* (1948) 335 U.S. 1 [68 S.Ct. 1375, 92 L.Ed. 1787].)'' (63 Cal.2d at pp. 642-643.)

*The documents seized at the time of the arrest of the nurse were not received in evidence at the hearing*

If it be assumed the records were unlawfully seized, the fact remains that they were apparently in the possession of petitioner at the time of the hearing when they were produced pursuant to subpoena. The board asserts that petitioner failed to object to the admission of evidence upon the grounds now asserted. The record, however, shows that the point was in fact raised.

The first suggestion of unlawful search or seizure was made in the course of the original argument on privilege as an objection to reference to or the admission in evidence of petitioner's patient record cards. Counsel for petitioner stated : "the other violation based on the basic rights of the individual is the manner in which they got the records . . ." and again "if you called somebody who illegally went in there and got those records, I'm sure you'd also have some other objections from me which I haven't yet reached."

When the nurse was interrogated concerning a list of Methedrine patients she had prepared, counsel stated: "I'll tell you in advance I've got an objection to your introducing that list . . . I want to know how you got the list . . . I want to examine Mr. Smith on voir dire before we go into this. They walked in there, you know, . . . we need a search warrant in this country." Argument preceded without permitting petitioner to show the circumstances under which the list and

allegedly other records were seized. The hearing officer after alluding to *People* v. *Cahan, supra,* 44 Cal.2d 434, *People* v. *Berger* (1955) 44 Cal.2d 459 [282 P.2d 509], and *Cooley* v. *State Board of Funeral Directors & Embalmers* (1956) 141 Cal.App.2d 293 [296 P.2d 588], concluded that the right to inspect and investigate operations conducted under a license granted by the state rendered the evidence admissible in a disciplinary proceeding.

When the investigator commenced to testify concerning the records taken at the time of the nurse's arrest, petitioner's counsel stated, ''I'm going to move it all be stricken unless this man had a search warrant''; and he subsequently so moved.

Finally, in connection with the motion to dismiss it was urged: ''My motion that there was an illegal search and seizure . . . should have been sustained.'' In argument petitioner's counsel also asserted: ''Not only were the records so seized inadmissible in evidence against Petitioner—but also any evidence gained by the police through investigations based solely upon the information contained in these records.''

A review of the evidence outlined above reflects that all of the patients' record cards were excluded with the exception of three, hereinafter discussed, for which consents were allegedly received from the patients. The investigator who reviewed the seized cards was permitted to testify to their general content. If this was error because of the tainted nature of his source, it was hardly prejudicial because his testimony that the cards reflected the palliative effect of Methedrine was cumulative to other admissions of petitioner which were properly in the record, and, as will be demonstrated, the testimony of petitioner himself.

Some reference, as noted above, was made to the lists of Methedrine patients which also are alleged to have been wrongfully seized. The record reflects that petitioner was not objecting to the admission of the comments written on the lists, and in fact stipulated that the notations could be admitted. The lists themselves, however, were excluded.

*The evidence admitted was not the tainted*
*fruit of the documents which had been seized*

At the hearing before the superior court, the learned trial judge posed the question: ''Suppose . . . from that information they got illegally, they received information which was put into the record, would that make any difference?'' He

subsequently pinpointed the matter by asking, "Where did they get those patients' names, did they get them as the result of that search; did they get them as the result of legally going into the pharmacy and inspecting their records?" The Attorney General took the position that the record was silent on that question and suggested that they could have been obtained in the latter manner and as a result of petitioner's prior testimony in three cases before the Board of Pharmacy. Petitioner took the position that since the record reflected that the investigator for the State Department of Professional and Vocational Standards had admittedly reviewed all of the records that related to people who were using Methedrine and had taken the list of Methedrine patients which the nurse had prepared, the conclusion that this case, and as well the Board of Pharmacy cases and the prosecution of the nurse all resulted from the seizure of the records was compelled.

The court's decision was expressed at the final hearing on the matter as follows: "I want this case remanded, because, one, in my judgment the records seized as the result of the arrest of the nurse, the records of Dr. Elder, was illegal. Two, the Court holds that evidence illegally seized cannot be admissible in an administrative proceeding, penal in nature such as this. Three, the case is remanded, that the case will be tried on that theory because it is obvious from this record, the whole record in this case, that this whole matter was tried on the theory that it doesn't make any difference in an administrative proceeding whether evidence is illegally seized or not, that evidence can be used to take away a man's license."

This decision as so expressed and as set forth in the trial court's findings of fact and conclusions of law cannot be reconciled with the record in the case. It has been demonstrated that there are no particular items of evidence which were before the board, and which it should exclude according to the attached mandate of the superior court. On the other hand, if the record in fact revealed that all or a substantial part of the evidence which was introduced was the fruit of an illegal search and seizure, the proceedings for revocation should have been dismissed.

The principle which petitioner apparently contends should be applied is reviewed in *People* v. *Bilderbach* (1965) 62 Cal.2d 757 [44 Cal.Rptr. 313, 401 P.2d 921], wherein it is stated: "That the prosecutor may not profit directly or indirectly from an illegal search has been the keystone of the rule including illegally obtained evidence." (62 Cal.2d at p. 763,

and see pp. 763-768.) In *Wong Sun* v. *United States* (1963) 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441], upon which *Bilderbach* relies, the opinion recites: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." (371 U.S. at pp. 487-488.) Similarly in *Silverthorne Lumber Co.* v. *United States* (1920) 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426], the court struck down an attempt to subpoena records which had been illegally seized, copied and then ordered returned. The opinion states: "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." (251 U.S. at p. 392.)

If it be assumed that these rules apply to proceedings of this nature the question resolves itself into a determination of whether the knowledge of the facts is gained from an independent source. In *Nardone* v. *United States* (1939) 308 U.S. 338 [60 S.Ct. 266, 84 L.Ed. 307], the court dealt with the mechanics of resolving this question in a case where there had been illegal wire tapping in violation of a federal statute. The opinion recites: "Sophisticated argument may prove a causal connection between information obtained through illicit wiretapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint. A sensible way of dealing with such a situation—fair to the intendment of § 605 [of 47 U.S.C.], but fair also to the purposes of the criminal law—ought to be within the reach of experienced trial judges. The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established—as was plainly done here—the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample oppor-

tunity to the Government to convince the trial court that its proof had an independent origin. Dispatch in the trial of criminal causes is essential in bringing crime to book. Therefore, timely steps must be taken to secure judicial determination of claims of illegality on the part of agents of the Government in obtaining testimony. To interrupt the course of the trial for such auxiliary inquiries impedes the momentum of the main proceeding and breaks the continuity of the jury's attention. Like mischief would result were tenuous claims sufficient to justify the trial court's indulgence of inquiry into the legitimacy of evidence in the Government's possession. So to read a Congressional prohibition against the availability of certain evidence would be to subordinate the need for rigorous administration of justice to undue solicitude for potential and, it is to be hoped, abnormal disobedience of the law by the law's officers. Therefore claims that taint attaches to any portion of the Government's case must satisfy the trial court with their solidity and not be merely a means of eliciting what is in the Government's possession before its submission to the jury. And if such a claim is made after the trial is under way, the judge must likewise be satisfied that the accused could not at an earlier stage have had adequate knowledge to make his claim. The civilized conduct of criminal trials cannot be confined within mechanical rules. It necessarily demands the authority of limited direction entrusted to the judge presiding in federal trials, including a well-established range of judicial discretion, subject to appropriate review on appeal, in ruling upon preliminary questions of fact. Such a system as ours must, within the limits here indicated, rely on the learning, good sense, fairness and courage of federal trial judges." (308 U.S. at pp. 341-342.)

In the instant case there is complete absence of an attempt to prove "that a substantial portion of the case against him was a fruit of the poisonous tree," and no timely steps were taken to exclude the evidence which in fact was presented. The evidence of the names of persons for whom petitioner prescribed was available from a source independent of his records, to wit, the prescription records of the pharmacists. Petitioner made no attempt to show that the use of these records was tainted by the seizure at the time of the arrest, but in fact stipulated, without reserving the objection now urged, that the pharmacists would testify to the prescriptions for those named in the accusation. The general objection presently asserted was not timely because, as has been set forth, it was

not made until all of the evidence, other than the testimony of petitioner, had been adduced.

It is concluded that the record neither specifically nor generally sustains the trial court's findings "that the evidence introduced at the hearing was the result of unlawful search and seizure."

*There was no prejudicial error in receiving*
*the patients' waivers and admitting their*
*record cards*

The judgment of the trial court in remanding the proceedings to the board not only directed the board to disregard any evidence or information obtained as the result of illegal search and seizure, but also proscribed use of any evidence obtained by misrepresentation. No finding of fact was made in this regard, but the conclusion is apparently predicated upon the statements of counsel for petitioner and an affidavit filed in connection with the petition for writ of mandate.

The issue raised by the petition is stated as follows: "Petitioner was not afforded a fair trial in . . . that during the hearing on June 18 and 19, 1963 agents of the respondent board went to three patients of petitioner; namely, Morris Sisneros, Peter Robert Blonkenfeld and Anthony De Piero and falsely and fraudulently represented to all three patients that they were representing petitioner and that petitioner requested them to authorize the release of their medical records to the respondent and relying on said false and fraudulent representations did sign the authorizations for the release of said records."

The petition for writ of mandate was filed July 23, 1963, and an alternative writ issued returnable August 19, 1963. The board's return was filed September 10th, and apparently arrangements were made for filing points and authorities with the court. On October 30th, petitioner filed an affidavit of Blonkenfeld which supported the allegations of the petition. No effort was made to present evidence as to the other two individuals from whom waivers of privilege had been secured despite the fact that the final hearing on the petition was not held until January 31st of the following year. Although petitioner attempted to explain his failure to go into the question at the hearing before the board on the grounds that the board desired to finish the hearing, the record does not reflect any request to the board to go into the matter but in fact only an expression of the desire of petitioner's counsel to conclude the proceedings on the second day of the hearing.

■ The records of the three individuals involved were cumulative in the sense that even if their names were deleted from the category of addicts to whom prescriptions were furnished, there remained a substantial number otherwise so identified. Therefore there was no prejudicial error in the receipt of their record cards.

*Since the evidence does not permit findings and conclusions contrary to those made by the board, the alternative writ should be discharged*

The question remains as to the disposition to be made of the case. The grounds set forth in the petition include: ''The decision is contrary to the evidence and without support in the record.'' The law prescribes: ''Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. . . .'' (Code Civ. Proc., § 1094.5, subd. (c); and see *Magit* v. *Board of Medical Examiners* (1961) 57 Cal.2d 74, 80 [17 Cal.Rptr. 488, 366 P.2d 816]; *Cooper* v. *State Board of Medical Examiners* (1950) 35 Cal.2d 242, 246 [217 P.2d 630, 18 A.L.R.2d 593]; and *Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20].) Petitioner has not had this review. The contentions which he successfully urged in the points and authorities filed with the trial court were those adopted by it in its judgment. It would appear proper to return the case to that court for a review of the evidence. *Magit,* however, indicates that where the evidence compels findings showing a violation of the provisions of law governing the practice of medicine, and the resulting unprofessional conduct which subjects the licensee to disciplinary action, a judgment of the superior court embodying contrary findings must be reversed. (57 Cal.2d at pp. 80-87.) Therefore, the evidence in this case must be examined to determine whether there is in fact a conflict to be independently weighed by the trial court.

The evidence produced by the board · has been set forth above. The evidence presented by petitioner consisted of letters of character reference and by his own testimony. The latter is embroidered with a categorical general denial that he ever knowingly or intentionally or wilfully treated a narcotic addict, either in his office or any other place, and specific denials as to each and all of the individuals named as addicts

in the other testimony before the board. The whole cloth of his testimony, however, reflects a semantic dispute as to what constitutes an "addict" or "ex-addict." In his initial explanation of what he was trying to do and how he began trying to help "these people," he stated: "I became interested in this about three years ago, when a patient came to me from another doctor who had quit the practice of medicine and in the history he explained to me that he had been a heroin addict and Methedrine in the amount of three ampules a day kept him a member of society, kept him away from heroin and was—he was able to work and carry on his work properly and to stay away from heroin or any of the other narcotics." In describing his procedures he stated, "they'd give me the history of their addiction. Q. And what would you do about that? A. Well, I would determine the length of time that they had been away from narcotics or alcohol or whatever the other drug they had been taking, and then try to determine what dosage of Methedrine or other things—I didn't always stick with Methedrine; that happens to be the main topic here—and try to rehabilitate these people to get away from—to stay away from their addiction and to become a part of society so they could maintain their jobs and act like human beings." It is obvious from his testimony that he was treating the patients for whom he was prescribing Methedrine, and the treatment was calculated to help the patient from reverting to narcotics.[15]

In discussing whether the patient could become addicted to Methedrine, petitioner expressed himself as follows: "I don't think they can be addicted to Methedrine. Of course the word 'addict' is a very ambiguous term, and it takes a lot of defining. People who—the word means to talk to, the Latin word to talk to something. So any time you talk for something, you can

---

[15]"Q. Now, Doctor, did you as a member of the medical profession, did you consider that you were violating the law or ethics of your profession in treating these unfortunates? A. No, sir. Q. Do you believe, Doctor, that you have succeeded in doing some good for these unfortunates? A. I think so. A great many of them. Q. Would you say how much in percentage? Would you say it would be ten percent? Fifteen percent? A. Percentagewise, between 60 and 70 percent of the patients have no record, either criminal or narcotic. They have taken themselves off of heroin and stayed off it. I'm sure many of them will never return to it. They give three reasons. Their first reason, of course, is economic. They can't maintain the habit economically. The second reason is because of stringency of the law and the penalties for being caught in possession or for using it or selling it. It's no longer a crime to be addicts, but it's a crime to procure the methods for being an addict, and these patients that have come to me with a record, either police or narcotic, those individuals are—the great majority of them are sincere in wanting to stay away,

be addicted to it, whether it's cigarettes or alcohol or playing golf or taking narcotics. It's a very broad term. It has many definitions, both medical and legal and literary, and it's a term that's pretty hard to pin down." Later he stated: "[A] definition of an addict that I use as a yardstick is anyone that has been on heroin or a narcotic—heroin is a narcotic— or who is a chronic alcoholic or who is chronically addicted to nembutal or any of that type of drug. . . . I think they become an addict when their use becomes compulsive." "An addict is one who is taking, who is at the time taking." He acknowledged: "Well, yes, there's dependency on it. Yes. The chief dependency in many of these individuals is to relieve their craving for narcotics. Q. Now, the craving for narcotics is one, I gather, you recognize to be a continuing one. A. I doubt if anyone ever gets over the craving for narcotics after they have had an established habit. . . . Q. Well, recognizing this craving, Doctor, will you tell us, please, your point of distinction between former addicts and addicts? A. The former addict is an individual who has gone through his withdrawal symptoms and is not at the time—whether it is 10 days or a week or two weeks or one year or two years—is not taking narcotics. And almost all of the narcotics now is heroin and narcotic addicts —Heroin is one after they take heroin they have no desire for any of the other narcotics because of its power and the effect on the mind and body. Q. And when the patients—at least some of the patients—who are on these Schedules, Appendices A, B and C, gave you the history, they still had a craving for narcotics. Is that correct? A. All of them had a craving."

He further stated: "the reason for prescribing the Methedrine ampules is to relieve the depression that these people go into. One of the chief reasons for a person craving heroin after he's away from it any length of time is he runs into some psychological or emotional or economic problem, and he straightaway has a desire to return to his former habits, to use heroin, particularly, as an escape. And you see it is this great psychological dependency on it that gives him his craving. If we can substitute something that will relieve his depression, and that depression sounds like a fairly innocuous word, but

and to the best of my ability I don't give these individuals a motive to lie to me. I don't put any restrictions on them except the first visit. In the first visit I tell them I will do what I can to help them, but I feel that every patient or every person must have a certain responsibility for his own illness and part of that responsibility is in obeying the doctor's instructions and being willing to be a little uncomfortable and not reverting to his—I refer to it as the child escape or it's practically a foetal escape of trying to get back on his heroin."

it's one of our great killers. Most of your suicides are predicated on depression, anxiety. Many of our alcoholics are on the same predication, and our insane asylums are full of people who are in depression in order to escape their inability to adjust to their environment, to the social swing."

He explained the prescription for ampules rather than pills as follows: "Well, the reason for that is that during an addict's acquiring and maintaining his habit, he develops a ritualistic fetish for the needle. He becomes needle happy, or they call it 'behind the needle,' and they like the ritual of preparing whatever they're going to take, whether it's Methedrine or a narcotic or distilled water or some of them will just use a needle just to be using it. It's a type of fetish that they develop, and I'm sure it's more a psychological thing than physical, and I'm sure that the doses of Methedrine tablets could solve their depression as well as the needle, but they prefer the needle, and I don't see what difference it makes how they take it."

He confirmed that he had instructed the nurse to refill the prescriptions in the manner she testified to, after he was unable to find a doctor who would see and prescribe for "these people."

In discussing dosage petitioner stated: "I think that the most effective dose is three ampules a day, the highest effective dose except in a few cases where their heroin addiction was tremendous, and then on four a day. I've had some patients tell me, who have been on a one-hundred-fifty to one-hundred-dollars-a-day habit, that any time a patient takes more than four ampules a day he's looking for extra kicks that he doesn't need, . . . I check it with the family or with somebody else as to how many they are taking a day. I try to talk to members of the family to watch them because the tendency of the drug addict is to overdose in anything they take. If they take aspirin, they'll take half a bottle. They're not content with ordinary doses because their system seems to have developed an affinity for these things. Q. Do you think, then, that in giving these large doses that you are really treating them medically? Or should you, in order to obtain a proper therapeutic response, get the dose down to what is used in normal therapeutics. A. That's what I try to do. I try to get them down as much as possible, to get them down to five a day, four a day, three a day, two a day, and finally get them off of it entirely, and keep them from reverting to going out on the street and buying it or trying to look around for heroin or some other drug to take. I try to figure out for each individual

an optimum dosage and then try to work him down, to get him to split the ampule, take only half a one, and some of these—ones that have a real needle fetish, that's fairly easy to do if you let them use a needle. Q. What is the shortest period of time in which you've been able to get them clear off Methedrine? A. I haven't much success with very many of them. It's about three months, three to six months. I'd say three months. Q. And what is the longest period of time you've continued to treat them? A. About three years. Some of them just can't get along without it. They can't work. They're depressed. They'll stay home, lie around the house; they won't get up and around. They start to revert to their narcotic state, if you wish to call it that—or post-narcotic state. It drives them to seeking something to help them.''

That the treatment was to substitute the dangerous drug for the narcotic drug is further evidenced by the following: ''Q. Would not, then, this be a direct treatment to continue their habituation to some drug or other? A. Well, I think they are going to be habituated to some drug or other, no matter what you do, and if the medical profession turns their back on these people, what are they going to do?''

The following exchange throws further light on the nature of the infirmity for which petitioner was prescribing: ''Q. But individually, in this very venturesome area, did you consider that you were really advancing the knowledge of the treatment of addicts? A. Yes, sir. I feel that this method, if other physicians would take this up and help these people and really help them, rather than to make a racket out of it as some doctors have done, give them all they want without any attempt to help them or treat them or any attempt to be friendly with them or work with them—I think that they're lost. There may be some better method developed than Methedrine. I read an article from Seattle that coenzyme that they're using—this probably will answer the physical craving, coenzyme injection, but I doubt if it will help the psychic part. And this illness is certainly a psychosomatic illness. And I've had—I've talked with—during this time I've been in court and talked with different attorneys, and from what information I could get I was doing nothing illegal.'' As also does the following statement: ''An addict that's on his full capacity of his addiction cannot work. He's absolutely no use to himself or society, and he's a burden on his family and society. But if you will give him something that will not injure him in proper dosage, then he has a substitute habit that he can work with, that he can be part of the community with. He can hold a job.''

Finally, petitioner gave as his diagnosis of his patients: "Would you care to state what the diagnosis of these patients was? A. Well, the diagnosis depends on No. 1, the history. If somebody tells me he's been an addict for two or three years ago, I mean that's enough to make a diagnosis on. If, in conjuncation [*sic*], you can see the evidence on his arm of old or recent needle marks. Q. Exactly. What would you put 'down as the diagnosis? A. Ex-addiction. Q. Ex-addiction? A. Yes, sir. Former drug addict or addiction, and give the dates as I usually do; heroin 1959 to 1961. That's why I've tried to keep this record, so that it would substantiate a 'diagnosis. And that's about all it takes, the diagnosis, the history of addiction and seeing needle marks.''

The trial court and petitioner's counsel acknowledged that if the evidence was properly before the board, as it is herein found to have been, the license was properly revoked.[16] The crucial question is whether persons treated for depression and a craving for narcotics who are offered Methedrine as a substitute for the narcotic which they crave and who will revert to narcotics if unable to get the Methedrine, are "addicts" or "ex-addicts." The Supreme Court of this state has recently reviewed the meaning of addict as applied for the purpose of commitment (*People* v. *Victor* (1965) 62 Cal.2d 280, 301-305 [42 Cal.Rptr. 199, 398 P.2d 391]), and as used in a statute prohibiting the operation of a motor vehicle by one addicted to the use of narcotics or certain 'dangerous drugs. (*People* v. *O'Neil* (1965) 62 Cal.2d 748, 752-756 [44 Cal.Rptr. 320, 401 P.2d 928]; and see also *People* v. *Washington* (1965) 237 Cal.App.2d 59, 65-68 [46 Cal.Rptr. 545]; *People* v. *Davis* (1965) 234 Cal.App.2d 847, 852 [44 Cal.Rptr. 825]; *McMurtry* v. *State Board of Medical Examiners* (1960) 180 Cal.App.2d 760, 769 [4 Cal.Rptr. 910]; and *People* v. *Jaurequi* (1956) 142 Cal.App.2d 555, 561 [298 P.2d 896].) The requisites of addiction are said to be (1) emotional dependence on the drug in the sense that the user experiences a compulsive need to continue its use, (2) a tolerance to its effects which lea'ds the user to require larger and more potent doses, and (3) physical dependence so that the user suffers withdrawal symptoms if he is deprived of his dosage. (*People* v. *O'Neil, supra,* 62 Cal.2d at p. 754.) It must be assumed in the instant case that the

---

[16]The record reflects: "THE COURT: I don't want you to believe that I think . . . if this evidence was legally in, that they wouldn't have had a right to revoke that license. COUNSEL: I agree with you. THE COURT: Because on the basis of this evidence illegally seized, it shows a course of conduct that well merited the taking-away of the license . . .''

professional members of the Board of Medical Examiners are as familiar with the literature on the subject of addiction as those who distilled the above test from the material footnoted in their opinions. The petitioner's testimony that he would treat after-withdrawal symptoms and was treating those who had had a habit, and the admission they were ex-addicts supplies the foregoing elements. The question then resolves into one whether the addict is no longer an addict while he is sustained by a substitute drug. It is manifest that he is being treated for something and if it is not his addiction, it is inconceivable what it can be. It is obvious that if the treatment given in this case is countenanced that the prohibitions on prescribing dangerous drugs for narcotic addicts or for treating them outside of designated institutions are meaningless.

Petitioner's statements tend to show that he was proceeding in good faith to give these admitted "ex-addicts" a substitute for their bodies' physical reaction to the termination of the administration of narcotic drugs in the belief that he was restoring them to a useful place in society. There is also evidence which tends to show that he was capitalizing from the unfortunates' need for a palliative for their habit by charging for prescriptions and refills with a minimum, if any, physical examination or attempt to test and reduce the dosage. It is not for this court to determine whether or not he was a Dr. Dooley or Dr. Schweitzer for the addicted denizens of the pavement jungle, or whether there are better methods of treating narcotic addicts than those which are provided by law. By his own admissions he has set up a course of treatment for those who admittedly have all the characteristics of addicts as defined in law and medicine.

Since the evidence in the record admits of only the findings and conclusions arrived at by the board they must be sustained.

The judgment is reversed with directions to the trial court to deny the petition and to discharge the alternative writ.

Sullivan, P. J., and Molinari, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 25, 1966. Peters, J., and Mosk, J., were of the opinion that the petition should be granted.