[Civ. No. 22471. First Dist., Div. Two. Feb. 18, 1966.]

CECIL RANDLE et al., Plaintiffs and Appellants, v. CALIFORNIA STATE BOARD OF PHARMACY, Defendant and Respondent.

Rex E. Shoop and Frank M. Brown for Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, and Gerald F. Carreras, Deputy Attorney General, for Defendant and Respondent.

AGEE, J.—Appellants, husband and wife, brought this mandate proceeding to set aside the decision of respondent board revoking appellant Lloyd R. Randle's certificate to practice pharmacy and appellant Cecil Randle's permit to maintain and conduct a pharmacy.

The two are jointly charged in the first four of the five counts alleged in the accusation filed with the board. The fifth count is against the husband alone. The wife's responsibility for the claimed misconduct is vicarious, being based upon *respondeat superior*. She employed her husband to manage and operate the pharmacy. The other employees were one full-time pharmacist (Bohm) and two part-time pharmacists. The wife's legal position herein will be discussed separately.

The board found, after a hearing before its hearing officer, that all five counts were true. The transcript of said hearing and the exhibits received in evidence thereat were received in evidence by the superior court and the cause submitted to it without the admission of any further evidence.

Exercising its own independent judgment on the evidence, the superior court found the first count to be untrue and the remaining four counts to be true. (Code Civ. Proc., § 1094.5.) In applying the substantial evidence rule to our review of the superior court's findings and judgment, we shall resolve all evidentiary conflicts in support thereof. (See 2 Cal.Jur.2d, Administrative Law, § 242, pp. 405-406.)

### Count One

This count charges a violation of Business and Professions Code section 4227 in that, between January 1, 1962

and August 7, 1962, appellants *sold* 38,441 Methedrine ampules without obtaining any prescription therefor.

 Methedrine is the trade name of an amphetamine, which is classified as a dangerous drug. (Bus. & Prof. Code, § 4211.) It is unlawful to furnish such a drug without first obtaining a proper prescription therefor. (Bus. & Prof. Code, § 4227.)

 There is no dispute that the 38,441 ampules are missing and unaccounted for. The proof shows that 132,000 ampules were sold and delivered to the pharmacy during the specified period, that only 2,640 ampules were on hand at the end of such period, and that the prescriptions on file for Methedrine during said period totaled only 90,919 ampules, thus leaving 38,441 ampules unaccounted for.

As opposed to this evidence, Randle testified unequivocally that he had never sold a Methedrine capsule without a prescription therefor.

The superior court found that the board's decision with respect to this count was not supported by "the weight of the evidence." (Code Civ. Proc., § 1094.5.) We cannot say that the court's finding is not supported by substantial evidence.

*Count Two*

 This count charges a failure to comply with Health and Safety Code section 11225 in that, between January 1, 1961 and August 7, 1962, appellants sold a specified quantity of two medicines containing narcotics, to wit, Terpin Hydrate with Codeine, and Cerodine, without making any record thereof. These medicines do not require a prescription. However, sales thereof must be recorded as provided by said section 11225.[1]

 Appellants maintained a regular "Exempt Narcotic Register" at the pharmacy, in which sales of narcotic medicines not requiring a prescription were recorded. These record books, covering the period in question, are in evidence.

In ascertaining the unaccounted for quantity of the two medicines, the board used the same method as that used with

---

[1]This section provides in pertinent part as follows: "Every person who . . . dispenses a narcotic shall make a record that, as to the transaction, shows all of the following: (a) The name and address of the patient. (b) The date. (c) The character and quantity of narcotics involved. (d) The pathology and purpose for which the prescription is issued, or the narcotic administered, prescribed, or dispensed."

respect to Count One, i.e., from the total quantity delivered to and received by the pharmacy during the period in question, there were subtracted the quantity recorded in appellants' "Exempt Narcotic Register" and the quantity left in stock at the close of said period.

Based upon this calculation, the board charged appellants with selling 6,072 4-ounce bottles and 1,614 2-ounce bottles of Terpin Hydrate with Codeine, and 3,259 4-ounce bottles and 1,005 2-ounce bottles of Cerodine, all "without [making] any record of the sale thereof as provided by Section 11225 of the Health and Safety Code;"

Randle testified before the hearing officer as follows: "Q. Now, with regard to Terpin Hydrate with Codeine, where you're required to enter sales of that in a book. A. Yes. Q. Did you or did you not enter those sales in a book? A. Yes, I did, and no, I didn't. . . . Q. And did you neglect to enter some in the book? A. I'm quite sure I did." "Q. Now, as I understood your testimony, you failed to place certain purchases of these items in the exempt register. Is that correct, sir? A. Yes."

Bohm testified that he also at times failed to record such sales. Neither of the two part-time pharmacists testified.

There is no way to determine from the record how many times, during the period in question, Randle violated section 11225 in the respects charged. It is obvious that he did not make *all* of said unrecorded sales during such period. Thus the general finding made by the board and adopted by the superior court, implying that he did, is in error to this extent.

However, this is a matter which relates more to the severity of the penalty imposed. It does not change the fact that appellant Randle admittedly did violate section 11225 as charged.

#### Counts Three and Four

Count Three charges a violation of Business and Professions Code section 4227 in that during the period of August 6-24, 1962, appellants sold 1,260 Methedrine ampules "without first having obtained a [*valid*] prescription" therefor.

Count Four charges that appellants *forged* and uttered 21 prescriptions purporting to authorize the dispensing of these same 1,260 ampules, in violation of Business and Professions Code sections 4237 and 4390.

Each prescription calls for 60 ampules and each is an original prescription, not a refill. All of said prescriptions were ordered over the telephone and each was filled out by either Randle (15) or Bohm (6) on prescription blanks kept at the pharmacy. The signature of Harry M. Elder, M.D. was written at the bottom of each by the one making the sale.

The routine followed with respect to these 21 transactions was that the customer would bring in a receipt which indicated payment of $7.50 to Dr. Elder for an office visit. Either Randle or Bohm would telephone Dr. Elder's office nurse and she would approve of a sale of 60 ampules of Methedrine to such receipt holder. The price charged by the pharmacy for this amount of the drug was $9.75.

Dr. Elder was out of the United States and on vacation during this entire period. On August 7, 1962 Randle admitted to the board's inspector, one Feyh, that he knew that Dr. Elder was away but that "arrangements had been made where he [Randle] would call the office for prescriptions in Dr. Elder's absence."

The inspector warned Randle at that time that this procedure was illegal. Randle admitted that he was so warned. He testified at the hearing that "Mr. Feyh said that the doctor had to personally phone the prescription in and that was it."

The board concedes that, during the period involved herein, a licensed physician was permitted to telephone a prescription for Methedrine to a licensed pharmacist. Such a phone call would authorize the pharmacist to fill out a prescription blank in accordance with the call and sign the physician's name thereto. A sale made by the pharmacist, pursuant to such a prescription, was not in violation of law and the signing of the prescribing physician's name to the prescription blank was not a forgery.

However, a nurse does not come within the class of persons authorized to prescribe or write a prescription. (Bus. & Prof. Code, § 4036.) Randle knew this. The following is an excerpt from his testimony: "Q. Do you know whether a nurse can, in fact, prescribe? A. A nurse cannot prescribe. Q. You know that? A. Yes."

Despite his knowledge of Dr. Elder's absence and in the face of the inspector's warning, Randle persisted in the same course of conduct. *All* of the 21 prescriptions charged herein were issued *after* such warning. Randle so testified, as follows: "Q. You continued on the same practice after you

learned of Dr. Elder's absence? A. Yes. Q. That made no difference to you? A. Well, I assumed the nurse had authorization to do so or she wouldn't have done it."

On Bohm's return from his vacation, about August 14, 1962, Randle told him of Dr. Elder's absence but instructed him to follow the practice of accepting the telephoned prescriptions of the office nurse. Pursuant to these instructions Bohm filled out and signed Dr. Elder's name to 6 of the 21 prescriptions involved herein.

It is obvious that the 21 prescriptions under which the 1,260 ampules in question were sold were not *valid* prescriptions and that, therefore, the finding that such ampules were sold "without first having obtained a prescription" therefor is supported by substantial evidence.

The interrelated fourth count charges forgery, in that Dr. Elder's name was signed as the prescriber on these 21 prescriptions without authorization from him to do so. The overwhelming circumstantial evidence supports this charge. All Randle offered in defense was his testimony, quoted above, that he "assumed the nurse had authorization" from Dr. Elder.

## Count Five

This count charges that Randle's certificate to practice pharmacy was revoked by the board on November 23, 1951. This revocation was based upon Randle's conviction on September 20, 1951, of a violation of Penal Code section 274 (abortion), a felony.

The same count charges that on August 12, 1959, Randle was convicted in the superior court in San Francisco of violating Health and Safety Code section 11170, subdivision (4), which offense (affixing false or forged label to package of narcotics) was reduced to a misdemeanor by the court at the time of sentence.

These two charges are admitted. Business and Professions Code section 4358[2], as in effect at all times pertinent herein, provided that a conviction of a violation of the State Narcotic Act (Health & Saf. Code, §§ 11000-11797) is ground for

---

[2]Sections 4036, 4227, and 4390 of the Business and Professions Code were amended in 1965; sections 4237 and 4358 of the same code were repealed and sections 4350.5 and 4358 (new) of said code were added at the same time. (Stats. 1965, ch. 1822.) No contention is made that any of this 1965 legislation has any bearing on any of the issues involved herein. In our opinion, any such contention would be without merit.

revocation of a license such as that held by Randle at the time of the present misconduct charged herein.

■ Turning now to Mrs. Randle, there is no evidence that she had any actual knowledge of the misconduct charged in the first four counts of the accusation. As stated before, the disciplinary action taken by the board with respect to her permit to conduct and maintain a pharmacy is based upon the doctrine of *respondeat superior*.

The rule applicable here may be drawn by analogy to the rule followed in the enforcement of the Alcoholic Beverage Control Act, under which "a licensee may be disciplined by the licensing authority for the unlawful acts of the employees while engaged in the conduct and operation of the business even though the employer did not authorize them and did not have actual knowledge of the activities." (*Presto* v. *Alcoholic Beverage etc. Appeals Board,* 179 Cal.App.2d 262, 265 [3 Cal.Rptr. 742]; *Morell* v. *Department of Alcoholic Beverage Control,* 204 Cal.App.2d 504, 514 [22 Cal.Rptr. 405].) Such discipline may extend to the revocation of the employer's license. (*Cooper* v. *State Board of Equalization,* 137 Cal.App.2d 672, 678 [290 P.2d 914].)

■ Mrs. Randle criticizes the wording of the accusation, contending that the charging allegations therein, such as "respondents sold" and "said sales were made by respondents without any record of the sale thereof," did not disclose the theory of *respondeat superior*. This is not necessary.

In *Cooper* v. *State Board of Equalization, supra,* it is stated: "It is well settled that a pleading alleging that defendant committed a certain act is simply an allegation that in legal effect the defendant is responsible for the act—i.e., that defendant through his agent committed the act or that defendant personally committed it. Either can be proved under an allegation that 'defendant' committed the act."

We come now to the question of penalty. The decision of the board revoking the certificate of Randle and the permit of Mrs. Randle provides as to each that "the above order of revocation is imposed for each of the separate and several violations herein found and determined. . . ."

As we have seen, the superior court set aside the board's finding as to Count One and sustained its findings as to the remaining counts. We have approved such holding. The superior court saw no abuse of the board's discretion as to the disciplinary action taken and therefore did not remand

the case to the board for a reconsideration of the penalty to be imposed.

In our opinion the charges against appellants which have been upheld by the superior court and by this court amply support the disciplinary action taken by the board. Under such circumstances, there is no necessity for any reconsideration of penalty by the board.

Headnote 7 in *Mast* v. *State Board of Optometry*, 139 Cal.App.2d 78 [293 P.2d 148], accurately states the holding of that case and the rule applicable here, as follows: "When an administrative tribunal after considering several charges against a licentiate makes a separate finding and imposes a specific sanction for each offense, the accused, in a mandate proceeding, is not entitled to have the cause sent back to the administrative agency for reconsideration of the penalty because the court vacates the administrative order as to some accusations, as would be the case if the penalty imposed had been based on collective rather than separate findings." To the same effect is *Caro* v. *Savage*, 201 Cal.App. 2d 530, 544 [20 Cal.Rptr. 286].

Judgment affirmed.

Shoemaker, P. J., and Taylor, J., concurred.