[Civ. No. 59716. Second Dist., Div. Two. Oct. 29, 1981.]

**VERMONT & 110TH MEDICAL ARTS PHARMACY et al.,**
Plaintiffs and Appellants, v.
**BOARD OF PHARMACY, Defendant and Respondent.**

20

COUNSEL

Fisher & Moest, Robert C. Moest and Barry A. Fisher for Plaintiffs and Appellants.

George Deukmejian, Attorney General, and M. Gayle Askren, Deputy Attorney General, for Defendant and Respondent.

OPINION

**COMPTON, J.**—The Board of Pharmacy of the State of California (Board) instituted administrative proceedings against the Vermont & 110th Medical Arts Pharmacy, its operator Dorothy F. Bailey Jackson and three pharmacists employed by Jackson.

After an administrative law judge dismissed the charges, the Board, exercising its authority under Government Code section 11517, refused to adopt the decision of the administrative law judge and instead adopted its own decision revoking the pharmacist license of petitioner Dorothy Jackson and her permit to operate the pharmacy. The license of one of the other pharmacists was revoked while the remaining two were suspended.

Petitioners next petitioned the superior court for a writ of mandate. They appeal from a judgment denying their petition. We affirm.

█ The trial court, exercising its independent judgment (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29]) found that the weight of the evidence preponderated in favor of the Board's findings (Evid. Code, § 115; *Dare v. Bd. of Medical Examiners* (1943) 21 Cal.2d 790 [136 P.2d 304]) and that the Board's findings supported the decision. We conclude that substantial evidence supports the trial court's judgment. (*Topanga Assn. For a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12]; *Moran v. Board of Medical Examiners* (1948) 32 Cal.2d 301 [196 P.2d 20].)

There is little controversy as to the essential facts. The issue presented is basically that of the scope of the duty of a pharmacist to verify the validity of prescriptions presented for filling.

The record discloses that the pharmacy in question, over a 45-day period filled 10,000 prescriptions written by a small group of doctors for 4 controlled substances which are popular in the illicit market. These prescriptions provided for 748,000 dose units. As an example, on one day the pharmacy filled 247 prescriptions written by one person—an unlicensed practitioner—for controlled drugs. This one unlicensed individual issued 4,000 prescriptions during the 45-day period—which prescriptions were all filled by petitioners.

Numerous prescriptions for controlled substances were filled in consecutively numbered batches for the same prescriber and were for the same person often with many different addresses. Certain names of patients were highly questionable. Examples with an automotive theme were "Henry Ford," "Fairlane Ford," and "English Ford." From the entertainment world were prescriptions for "Glenn Ford," "Esther Williams," "Steve Allen," "Jerry Lewis," "Johnny Cash," "Terry Tune," "Van Johnson," "Bill Boyd," "James Brown," "Pop Warner" and "Tony Randall." The world of banking was represented by "Wells Fargo." Personages from their own world were one "Sweet Tongue Hawkins" and someone known only as "Pearl Harbor."

Many of the foregoing prescriptions were submitted for the same name but with different addresses on the same day. Many of the addresses were nonexistent. Significantly, the foregoing prescriptions were all for controlled drugs.

Ritalin, a stimulant, and Tuinal, a hypnotic drug, used to induce sleep were prescribed for three different individuals in three prescriptions on the same day by the same physician. These antagonistic prescriptions for drugs were honored without being questioned. Instances of honoring multiple prescriptions for the same individual on the same day were also noted by the Board inspectors with no apparent indication that the prescriber had been queried by the dispensing pharmacist.

Although certain pharmacists at the pharmacy had questioned the propriety of the dispensing practices, notably that of honoring numerous prescriptions for one individual at the same time, and had communicated their unease to Jackson, no change in the pharmacy procedures took place and the warnings were apparently unheeded.

The Board concluded that considering the aforementioned circumstances, the pharmacists at the pharmacy should have been on notice of the suspicious nature of the prescriptions they were filling. There was no reasonable probability that the prescriptions could have been made for legitimate medical purposes. The Board specifically found that petitioners knew that the prescriptions were not issued for legitimate medical purposes.

The Board revoked individual licenses and the pharmacy permit based upon their findings of violation of (1) Health and Safety Code

sections 11152 and 11154, read consecutively,[1] (2) violation of Health and Safety Code section 11153, and 21 United States Code Annotated section 841, and 21 Code of Federal Regulations section 1306.04 (a)[2] and (3),[3] and violation of Business and Professions Code section 4350.5, subdivision (d). Additionally, the Board found violation of Business and Professions Code section 4363, which proscribes unprofessional conduct on the part of any pharmacist violating California statutes regulating narcotics and dangerous drugs.

Petitioners contend that the Board's action was invalid due to lack of guidelines setting forth the duties of their profession in this set of circumstances and to inform them of what factors should cause them to question the *actual* validity of a *facially* valid prescription. They simultaneously urge that there is no particular regulation which proscribes the conduct in which they are alleged to have engaged. They portray their conduct as the filling of large numbers of prescriptions regular on their face and employing reasonable means to weed out forged or improper prescriptions.

---

[1]Health and Safety Code section 11152 provides: "No person shall write, issue, fill, compound, or dispense a prescription that does not conform to this division."

Health and Safety Code section 11154 provides: "Except in the regular practice of his profession, no person shall prescribe, administer, dispense, or furnish, a controlled substance to or for any person who is not under his treatment for a pathology or condition other than addiction to a controlled substance, except as provided in this division."

[2]Health and Safety Code section 11153 provides: "The responsibility for the proper prescribing and dispensing of controlled substances is upon the practitioner, but a corresponding liability rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued to an addict or habitual user of controlled substances, which is not in the course of professional treatment nor part of an authorized methadone maintenance program, for the purpose of providing the user with controlled substances, sufficient to keep him comfortable by maintaining his customary use, is not a prescription within the meaning and intent of this division; and the person filling such an order, as well as the person issuing it, may be charged with violation of the law."

[3]Business and Professions Code section 4350.5 provides in part: "The board shall take action against any holder of a certificate, license, permit, registration or exemption, who is guilty of unprofessional conduct which has been brought to its attention, . . . . Unprofessional conduct shall include but is not limited to the violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of or conspiring to violate any provision or term of this chapter or of the laws governing pharmacy, or of regulations established by the board. Unprofessional conduct shall also include but is not limited to the following: (a) gross immorality, (b) gross incompetence, (c) the commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of relations as a licensee or otherwise, and whether the act is a felony or misdemeanor or not, (d) gross negligence, (e) actions or conduct which would have warranted denial of a certificate, license, permit, registration or exemption."

Health and Safety Code section 11152 provides that no prescription shall be dispensed except in conformance with the Uniform Controlled Substances Act (Health & Saf. Code, §§ 11150-11179). Section 11154 provides that no person shall "... dispense ... a controlled substance to or for any person who is not under his treatment for a pathology or condition other than addiction to a controlled substance, except as provided in this division." Thus, for a physician to prescribe a controlled substance for an addict or a person not medically requiring a drug is violative of section 11154. A corresponding liability has been imposed upon a pharmacist to conform to section 11154 as well. (See § 11153; 21 C.F.R. § 1306.04(a) (1981).) A pharmacist who would escape liability for dispensing drugs not intended for proper medical treatment or for dispensing to a known addict, must refuse to dispense when he believes the statute has been violated.

The statutory scheme plainly calls upon pharmacists to use their common sense and professional judgment. When their suspicions are aroused as reasonable professional persons by either ambiguities in the prescriptions, the sheer volume of controlled substances prescribed by a single practitioner for a small number of persons or, as in this case, when the control inherent in the prescription process is blatantly mocked by its obvious abuse as a means to dispense inordinate and incredible large amounts of drugs under the color and protection of law, pharmacists are called upon to obey the law and refuse to dispense. To fail to do so is either gross incompetence, gross negligence or moral turpitude. (See Bus. & Prof. Code, § 4350.5, defining misconduct as grounds for action by the Board.)

A profession is a vocation or occupation requiring special and advanced education and skill predominately of an intellectual nature. The practice of pharmacy, like the practice of medicine, is a profession.

For this reason, society entrusts to persons in these professions the responsibility for control over a force which, when properly used, has great benefit for mankind, but when abused is a force for evil and human destruction.

It follows that society cannot tolerate the presence of individuals within these professions who abdicate their professional responsibility and permit themselves to be used as a conduit by which these controlled substances reach the illicit market and become that force of evil to which we allude.

More importantly, for this case, such prostitutors of their profession will not be heard to explain their dereliction by the juvenile-like complaint "Nobody told me it was wrong." A true professional does not have to be told such things.

The remaining contention that there was no substantive support in the record for the Board's conclusions does not merit discussion.

The judgment is affirmed.

Roth, P. J., and Beach, J., concurred.

A petition for a rehearing was denied November 25, 1981, and appellants' petition for a hearing by the Supreme Court was denied December 23, 1981.