[No. D021247. Fourth Dist., Div. One. July 31, 1995.]

THOMAS SMITH, Plaintiff and Appellant, v.
CALIFORNIA STATE BOARD OF PHARMACY, Defendant and
Respondent.

COUNSEL

Sheldon Sherman for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Ronald Russo, Assistant Attorney General, Anthony M. Summers and Ronald A. Casino, Deputy Attorneys General, for Defendant and Respondent.

OPINION

NARES, J.—Thomas Smith, former pharmacist-in-charge of the Parkway Pharmacy in San Diego (Parkway), appeals a judgment denying his petition for a writ of administrative mandamus. Smith seeks to set aside a decision of the California State Board of Pharmacy (Board) adopting a decision of an administrative law judge (ALJ) revoking his license to practice pharmacy. The ALJ found Smith's license was subject to discipline for unprofessional conduct due to his (1) clearly excessive furnishing of controlled substances (Bus. & Prof. Code,[1] § 4350.5, subd. (e)[2]); (2) deceit and dishonesty in removing and keeping pharmacy records (§ 4350.5, subd. (c)); and (3) failing to preserve records of prescriptions filled for three years (§§ 4350.5, 4232, 4331).

Smith contends (1) the failure of the accusation to inform him that the Board was charging or going to rely upon a negligence theory constituted a procedural due process violation; (2) his license could not have been revoked based on the finding of ordinary negligence; and (3) the lower court should have reviewed the penalty imposed and found it was an abuse of discretion as being excessive.

As to the charge of clearly excessive furnishing of controlled substances, we conclude Smith was deprived of due process. Accordingly, we reverse.

---

[1] All statutory references are to the Business and Professions Code unless otherwise specified.

[2] In an apparent typographical error, the ALJ's written determination adopted by the Board cites section 4350.5, subdivision "(c)," which pertains to acts "involving moral turpitude, dishonesty, fraud, deceit, or corruption." Subdivision (e) of the section pertains to "clearly excessive furnishing of controlled substances," corresponding to the language of the written determination by the ALJ.

The ALJ earlier found the "excessive furnishing of drugs was not a result of Smith's intentional course of action but resulted from his *extreme neglect* of his professional duties. This *negligence* does not equate to moral turpitude." (Italics added.) Accordingly, we conclude the reference to subdivision (c) was a typographical error meant to refer to subdivision (e).

PROCEDURAL AND FACTUAL HISTORY

*The Charges Against Smith*

An accusation dated September 3, 1991, by Board executive officer Patricia F. Harris sets forth the Board-licensed status of Smith since October 3, 1984, and of James Roth, doing business as Parkway, since July 1, 1982. Under the heading "STATUTES" the accusation states it is made with reference to a list of 13 statutory provisions which it cites and describes. Among those descriptions are:

"4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"b. *Section 4350.5* provides that the Board may discipline a license holder who is guilty of unprofessional conduct, which shall include, but is not limited to the violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation, of any provision or term of Chapter 9, Division 2, of the Code or of the applicable federal and state laws and regulations governing pharmacy including regulations established by the Board.

"c. *Section 4350.5(c)* provides that unprofessional conduct includes the commission of any act involving moral turpitude or dishonesty whether committed in the course of relations as a licensee or otherwise.

"d. *Section 4350.5(e)* provides that unprofessional conduct includes the excessive furnishing of controlled substances in violation of subdivision (a) of section 11153 of the Health and Safety Code.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"f. *Section 4054* provides the following: (1) that every pharmacy which dispenses prescriptions shall be in charge of a registered pharmacist; (2) that every pharmacy shall have a pharmacist-in-charge who shall be responsible for the pharmacy's compliance with laws and regulations, both state and federal, pertaining to the practice of pharmacy . . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"h. *Section 4232* provides in relevant part that all records of sale of dangerous drugs shall be open to inspection by authorized officers and shall be preserved for at least three years from the date of making. The owner,

officer, and partner of any pharmacy shall be jointly responsible, with the pharmacist-in-charge, for maintaining the records.

"i. *Section 4331* provides that all prescriptions filled shall be kept on file and open for inspection by duly constituted authorities for at least three years."

Also included in this part of the accusation are descriptions of Health and Safety Code sections with reference to which the accusation is made, as follows:

"5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"a. *Section 11179* provides that a person who fills a prescription shall keep it on file for at least three years from the date of filling it.

"b. *Section 11153(a)* provides that a prescription for a controlled substance shall only be issued for a legitimate purpose by an individual practitioner acting in the usual course of his or her professional practice. The pharmacist who fills the prescription shares a corresponding responsibility with the prescribing practitioner for proper prescribing.

"e. [*sic*] *Section 11158(a)* provides that no controlled substances classified in Schedules III or IV shall be dispensed without a prescription."

Under the heading "FACTS UNDERLYING ALLEGATIONS AGAINST SMITH" the accusation lists numerous charges naming Smith as the subject and using such verbs in the active voice as, "Smith dispensed," "Smith furnished," or "Smith removed." These factual allegations against Smith read as follows:

"7. Respondent Thomas Smith has subjected his license to discipline based on the following facts:

"a. On or about January 18, 1989, 38-year-old John Michael Stoner, whose true name was John Globish, was found dead in a motel room in San Diego. Codeine and diazepam poisoning was determined to be the cause of death. Seven prescriptions dispensed by respondent Parkway Pharmacy, including two for diazepam and one for cocaine, were discovered in Stoner's motel room.

"b. On or between July 11, 1988, and December 9, 1988, respondent *Smith, while* employed by Parkway Pharmacy as *pharmacist-in-charge, dispensed* approximately eighteen (18) prescriptions of *diazepam to Stoner* in

quantities of 100-10 mg. tablets per prescription, often only a few days apart. Over the above period of time, *Stoner was furnished* approximately *1800 tablets of diazepam by* respondent *Smith.*

"c. In addition and with reference to the conduct described in paragraph b above, respondent *Smith dispensed diazepam to Stoner without an authorized prescription,* written or oral, from any prescribing physician. Dr. Kenneth Easler, whose name appeared on the prescriptions as the prescribing physician, did not authorize the furnishing of any drug or substance to Stoner.

"d. On or between May 27, 1988, and December 9, 1988, respondent *Smith, while* employed by respondent Parkway Pharmacy as the *pharmacist-in-charge, dispensed* eighteen (17) [*sic*] prescriptions of *APAP codeine to Stoner* in quantities of 200-60 mg. tablets per prescription, often only a few days apart. During the above period of time, respondent *Smith dispensed approximately 3400 tablets of codeine to Stoner.*

"e. In addition and with reference to conduct described in paragraph d above, respondent *Smith dispensed codeine to Stoner without a prescription* having been written by a prescribing physician. Dr. Kenneth Easler, whose name appeared on the codeine prescriptions as the prescribing physician, did not authorize the furnishing of any drug or substance to Stoner.

"f. On or between August 6, 1988, and December 9, 1988, respondent *Smith,* while employed as pharmacist-in-charge of respondent Parkway Pharmacy, *dispensed* approximately sixteen (16) prescriptions of 20 .25 mg. tablets of *halcion to Stoner,* often only a few days apart. During the above period of time, respondent *Smith dispensed approximately 320 tablets of halcion to Stoner.*

"g. In addition and with reference to the conduct described in paragraph f above, respondent *Smith dispensed halcion to Stoner without a prescription* having been written by a prescribing physician. Dr. Kenneth Easler, whose name appeared on the halcion prescriptions as the prescribing physician, did not authorize the furnishing of any drug or substance to Stoner.

"h. Based on the conduct described in paragraphs 5b, 5d and 5f[3] above, respondent *Smith* is guilty of unprofessional conduct under sections 4350.5, 4350.5(c) and 4350.5(e) with reference to section 11153(a) of the Health and Safety Code, in that he *furnished excessive amounts of controlled substances to John Stoner* which ultimately resulted in his death.

---

[3]There is no paragraph 5d or 5f. From the context it appears these references were to the specified subdivisions in paragraph 7 of the accusation.

"i. Based on the conduct described in paragraphs 5c, 5e and 5g[4] as delineated above, respondent *Smith* is in violation of sections 4350.5 and 4227(a) with reference to Health and Safety Code section 11158(a) in that he *furnished dangerous drugs to Stoner without a legally authorized prescription* having been written therefor.

"j. On or about January 25, 1989, respondent *Smith removed* several boxes of prescription and pharmacy *records* from Parkway Pharmacy and without the consent or knowledge of James Roth, the owner of Parkway Pharmacy.

"k. Based on the conduct described in paragraph j above, respondent Smith is guilty of unprofessional conduct and is subject to disciplinary [*sic*] pursuant to section 4350.5(c), in that respondent *Smith removed records* from Parkway Pharmacy for the purpose of concealing evidence concerning Stoner's death." (Italics added.)

All but one of the violations alleged in the above quoted provisions setting forth the facts underlying the allegations in the accusation include a general citation (without specifying a particular subdivision) to section 4350.5,[5] unprofessional conduct, which encompasses "violating or attempting to violate, directly or indirectly, or assisting or abetting the violation of or conspiracy to violate any provision or term" of the pharmacy and controlled substance laws and regulations, both state and federal.

After setting forth factual allegations against Parkway, the accusation prays for revocation or suspension of Smith's and Parkway's licenses, and such other action as the Board deems appropriate to protect the public health, safety and welfare.

*Smith's Initial Employment at Parkway Pharmacy*

In October 1984 the Board issued Smith a license to practice pharmacy. In mid-April 1988, after several months of working as a part-time pharmacist at Parkway relieving the pharmacist-in-charge, John Jennings, about once a week, Smith replaced Jennings as the pharmacist-in-charge. Jennings quit Parkway because its unlicensed owner, Jim Roth, was supplying prescriptions to people including Roth's friend, John Stoner, and going into the

---

[4]There is no paragraph 5c or 5g in the accusation. Again, from the context, it appears these references are to the specified subdivisions in paragraph 7.

[5]The single alleged violation not including a general citation to section 4350.5 pertained to Smith's admitted removal of the prescription records from Parkway, a matter not involving negligent conduct and clearly outside the scope of his argument about the absence of notice of charges of negligence. This violation was charged as unprofessional conduct "subject to [discipline] pursuant to section 4350.5(c)," which speaks of acts "involving moral turpitude, dishonesty, fraud, deceit, or corruption."

pharmacy when Jennings was not there. When Jennings quit he told Smith about Roth's having access to the pharmacy by means of an extra key.

*Stoner's Prescriptions From Parkway*

After Stoner was found dead in his San Diego motel room on January 18, 1989, it was determined he apparently had ingested drugs. Of the nine prescription bottles containing drugs found at the scene of Stoner's death, seven were labeled from Parkway and contained such controlled substances as APAP/Codeine, Diazepam and Halcion, as well as Dycill and Prednisone. APAP/Codeine, Diazepam and Halcion are dangerous drugs available only by prescription (§ 4211) and are used, respectively, for relief of mild to moderately severe pain, anxiety disorder and muscle spasm, and insomnia. During Smith's employment as Parkway's pharmacist-in-charge (and sole pharmacist), the following amounts of these three drugs and their respective maximum dosages were dispensed from Parkway to Stoner during the dates indicated:

*APAP/Codeine*—Maximum 24-hour dose, 6 tablets:

May 27, 1988, to December 9, 1988: 17 prescriptions in quantities of 200, 60-milligram tablets each, for a total of 3,400 tablets, representing an average of 17 tablets per day for the 6.5-month period. In the December 2 to December 9 portion of this period, Parkway dispensed a total of 300 tablets to Stoner, an average of 37.5 tablets per day.

*Diazepam*—Maximum 24-hour dose, 4 tablets:

July 11, 1988, to December 9, 1988: 18 prescriptions in quantities of 100, 10-milligram tablets each, for a total of 1,800 tablets, representing an average of about 11 tablets per day for about 5 months. In the August 20 to September 9 portion of this period, Parkway dispensed a total of 400 tablets to Stoner, an average of 19 tablets per day.

*Halcion*—Maximum 24-hour dose, 2 tablets:

July 11, 1988, to December 9, 1988: 18 prescriptions consisting of 352 tablets at .25 milligrams each. In the November 4 to November 17 portion of this period Parkway dispensed a total of 80 tablets, an average of more than 5 tablets per day.

As to each of the three circumstances the Board adopted the ALJ's finding it constituted clearly excessive furnishing of a controlled substances within the meaning of section 4350.5, subdivision (e).[6]

Stoner had been a regular customer at Parkway since at least 1985. He and Roth were friends. Kenneth Easler, M.D., a longtime friend of Roth, had his office in the same building as Parkway. Roth employed Easler's son as a delivery man. On occasion, Easler, Roth and Stoner were seen talking together in the pharmacy. Each of the controlled substance prescriptions described above was purportedly written or authorized by Easler.

*Smith's Awareness and Conduct Relating to Stoner and Roth*

At some point while he was pharmacist-in-charge, Smith became aware that Roth was dispensing drugs to Stoner, purportedly for a painful venereal condition. Smith had several arguments with Roth about the proper manner of operating the pharmacy and he believed Roth had stopped the improper dispensing.

In November 1988 Smith suspected Roth had keys to the pharmacy and was entering the licensed area when the pharmacy was closed. Smith confronted Roth about his improper presence in the licensed area and in late November or early December, Smith installed a security system to prevent Roth from entering the pharmacy alone. The records indicate that Stoner's last prescription from Parkway was filled December 9, 1988.

---

[6]Section 4350.5 provides in pertinent part:

"The board shall take action against any holder of a certificate, license, permit, registration or exemption, who is guilty of unprofessional conduct which has been brought to its attention . . . . Unprofessional conduct shall also include, but is not limited to, the following:

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(e) The clearly excessive furnishing of controlled substances in violation of subdivision (a) of Section 11153 or subdivision (a) of Section 11153.5 of the Health and Safety Code. Factors to be considered in determining whether the furnishing of controlled substances is clearly excessive for purposes of subdivision (a) of Section 11153.5 of the Health and Safety Code shall include, but not be limited to, the amount of controlled substances furnished, the previous ordering pattern of the customer (including size and frequency of orders), the type and size of the customer, and where and to whom the customer distributes its product."

Health and Safety Code section 11153, subdivision (a) reads in part, "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding *responsibility rests with the pharmacist who fills the prescription*." (Italics added.)

Health and Safety Code section 11153.5 applies only to wholesalers, manufacturers and their respective agents or employees, and thus has no application to this case. (See Health & Saf. Code, §§ 11017, 11031; Bus. & Prof. Code, §§ 4034, 4038.)

*Computer Records Naming Smith as Dispensing Pharmacist for Stoner*

The computer-generated patient profile for Stoner produced during the investigation of this case reflects that for each of the prescriptions issued to him in 1988, Smith was the dispensing pharmacist. Although Stoner had been obtaining the controlled substance prescriptions from Parkway on a regular basis since December 1987, he began doing so on a weekly basis in August 1988, while Smith was the pharmacist-in-charge. Concerning these facts the ALJ found in part: "Smith cannot disclaim all responsibility for the excessive furnishing of controlled substances to Stoner. As pharmacist-in-charge and the only pharmacist in the store, he is responsible for knowing or making reasonable attempts to know the amount of controlled substances issued to a regular customer. . . . Smith had sufficient reason to believe, at least by August, 1988, that controlled substances were being improperly dispensed to Stoner either by Roth or one of the clerks. The medications dispensed to Stoner were entered into the computer, with or without having a proper prescription to support it. It was Smith's duty to review and sign the daily reports which would have revealed the drugs dispensed to Stoner. Respondent was too busy to review the daily reports and, because he assumed he knew everything that was dispensed, saw no need to review the reports. After being advised by his sister[7] of Stoner's special will-call bags respondent could have at least pulled Stoner's patient profile from the computer to confirm the drugs dispensed. Respondent had the reason and the means to apprise himself of the controlled substances being dispensed to Stoner but he failed to do so."[8]

*Smith's Removal of Pharmacy Records*

Soon after he learned of Stoner's death in January 1989, Smith consulted an attorney who advised him to immediately make copies of certain pharmacy records. In late January, Smith and his attorney removed six boxes of prescriptions and computer printouts. The records were not immediately copied. They remained with Smith's attorney until early March 1989. Neither Smith nor his attorney informed Roth or any public authority the records had been taken.

On March 3, 1989, a Board investigator interviewed Smith and asked if he had removed any records. Smith admitted taking the records and agreed to

---

[7]Smith's sister had been working as a clerk at Parkway since February 1988. She was instructed by the other two clerks that Stoner had a "special account" and only they were authorized by Roth to give Stoner the will-call bag containing his order. In about August 1988, Smith's sister told him about the special will call bags for Stoner that she was not allowed to handle.

[8]As noted in footnote 2, *ante*, the ALJ and Board found no clear and convincing evidence that Smith's involvement in the excessive furnishing of drugs to Stoner amounted to moral turpitude.

have them released by his attorney. On March 10, 1989, Smith finally made copies of the records and delivered the originals to the Board investigator.

The ALJ found it was not established Smith removed the records to conceal evidence concerning Stoner's death and under the circumstances it was not unreasonable for Smith to want to preserve the documents. However, the ALJ found in part: "[Smith's] manner of preserving the documents was deceitful. He took records which did not belong to him, without notice to the owner even after they had been safely removed, and without any intent to return them to the owner or to deliver them to proper authorities. Smith is unable to explain how anyone entitled to the documents was supposed to know where they were. It is apparent that the records were copied and returned only because a Board investigator made inquiry. Respondent took records which the pharmacy is required by law to preserve and keep available for inspection for three years. He knew it was wrong to take and keep the documents and the fact that he was encouraged to do so by his attorney does not exonerate him."

### Absent Records of Prescriptions

During Smith's time as Parkway's pharmacist-in-charge, 10 prescriptions of controlled substances filled for Stoner were not available for inspection, a violation of sections 4232 and 4331 prescribing a 3-year period for maintaining records of prescriptions and keeping the records open for inspection by authorized officers.

### Discipline Imposed on Smith

Finally, in determining the discipline to impose the ALJ considered the following: "Smith's testimony was in large part not credible. His demeanor and attitude while testifying, his often inconsistent testimony and his non-responsive answers weaken his credibility. Even after his unfortunate experience with Parkway Pharmacy, Smith shows no understanding of his professional responsibilities. His sole interest is in producing a record number of prescriptions per day. He has no insight into the fact that his focus on volume and speed caused him to neglect duties which are meant to safeguard against a wrongful or excessive dispensing of controlled substances. Smith does not accept any responsibility for the excessive dispensing which was allowed to occur on his watch. He chooses to place blame on everyone but himself. He shows no concern or interest in revising his negligent ways. He gives every indication that if allowed to continue the practice of pharmacy he will continue to ignore his statutory and common sense responsibilities."

Thus, the ALJ issued, and the Board adopted, an order revoking Smith's license to practice pharmacy.

DISCUSSION

I

■ Smith contends the failure of the accusation to inform him that the Board was going to rely upon a negligence theory constituted a procedural due process violation. We agree.

■ Government Code section 11503 establishes the constitutionally required notice to the accused of the standards by which the accused's conduct is to be measured. (*Wheeler* v. *State Bd. of Forestry* (1983) 144 Cal.App.3d 522, 527 [192 Cal.Rptr. 693], and cases cited.) Government Code section 11503 reads, in part: "The accusation . . . shall set forth in ordinary and concise language the acts or omissions with which the respondent is charged, to the end that the respondent will be able to prepare his defense. It shall specify the statutes and rules which the respondent is alleged to have violated, but shall not consist merely of charges phrased in the language of such statutes and rules."

In *Stearns* v. *Fair Employment Practice Com.* (1971) 6 Cal.3d 205, 213 [98 Cal.Rptr. 467, 490 P.2d 1155], the court points out, "[Administrative] proceedings are not bound by strict rules of pleading . . . . So long as the respondent is informed of the substance of the charge and afforded the basic, appropriate elements of procedural due process, he cannot complain of a variance between administrative pleadings and proof."

■ Here, the accusation's exclusive use of the active voice, "Smith dispensed" and "Smith furnished," both with reference to the alleged transfers of drugs to Stoner, strongly conveys the message that Smith stood charged with *personally* dispensing or furnishing the drugs to Stoner.[9] The rectitude of this conclusion is fortified by the Board's prehearing conference statement, "the drugs . . . were dispensed by respondent Smith, the pharmacist in charge at Parkway . . . ." Even more so, this conclusion is supported by the transcript of the hearing before the ALJ in which it is shown that closing argument was the first time it was disclosed the Board was relying on a negligence theory in seeking to uphold the charges against Smith.[10]

In addition, counsel for the Board acknowledged to this court at oral argument that the accusation appears to charge Smith with actually doing the

---

[9] The active voice use of "Smith dispensed" and "Smith furnished" is a use of words parallel to the clearly intended active voice use of "Smith removed" with reference to the allegation of his having taken records from the pharmacy.

[10] In closing argument before the ALJ, counsel for the Board stated, in part, "The accusation could have been more artfully drafted to allege the alternative theory of negligence, but I argue that the statutory duty to comply with the laws in 4350.5(c)—or excuse me. 4350.5—

dispensing. More significantly, counsel for the Board also conceded at oral argument that going into the hearing the Board was trying to prove Smith personally, volitionally dispensed the drugs. Counsel also candidly disclosed, however, that when he saw he was not able to prove Smith's personal, volitional dispensing, he shifted the Board's case to one of proving Smith was responsible for the dispensing done by others.

On this record, it is clear that the accusation did not afford Smith the basic, appropriate elements of procedural due process, in that he was misled by the accusation and the prehearing conference statement into believing he needed to prepare a defense to the personal dispensing charges. During the hearing of the charges, it became apparent to the Board that the personal dispensing charges could not be sustained, and so without notice to Smith, the Board shifted its theory to one of negligence by Smith as the pharmacist-in-charge of Parkway. In this connection, we note that section 4054, the provision on which the Board relied to uphold its negligence theory (see fn. 10, *ante*), is not mentioned in the ALJ's determination of issues.[11] In her resolution of the excessive dispensing charge against Smith, however, the ALJ does make reference to a finding sounding in negligence that Smith "had the reason and the means to apprise himself of the controlled substances being dispensed to Stoner but he failed to do so."

Smith's preservation of the due process issue is shown in his argument:

". . . Smith confronted Mr. Roth saying, I think something illegal is going on with Mr. Stoner and you better stop it. [¶] What else is a pharmacist to do? [The Board] has certainly not indicated what a reasonably prudent pharmacist should have done. There's been no testimony that a reasonably prudent pharmacist should have done X, Y, or Z, so what's the standard of care? Are we to speculate on it? Are we to make it up out of whole cloth? What is the evidence to support that contention? Where is it alleged in the accusation? I think that [Board's counsel] is being charitable by saying that maybe the accusation could have been pled more artfully. I mean *there's no pleading of negligence.*

"Are we to abrogate the rules of due process because [Board's counsel] needs a fall-back position? Were we alerted to the fact that we would need

a statutory duty of 4054 of the B and P Code, indicating that a pharmacy must have a pharmacist in charge who shall be responsible for compliance with the laws, is the statutory duty that gives rise to the idea that failure to be careful and to fulfill that duty can be the basis for negligent conduct."

[11]Section 4054 is described in the accusation's series of statutory descriptions. (See p. 233, *ante*.) The second clause of the section 4054 description is it provides "that every pharmacy shall have a pharmacist-in-charge who shall be responsible for the pharmacy's compliance with laws and regulations, both state and federal, pertaining to the practice of pharmacy . . . ." (§ 4054, subd. (b).)

an expert witness on standard of care? *I think it's certainly a violation of due process to talk about standard of care and negligence in final argument when it hasn't been alleged,* hasn't been proven, there's been no testimony." (Italics added.)

■ We are aware of the general rule that a pleading alleging the defendant " 'committed a certain act is simply an allegation that in legal effect the defendant is responsible for the act—i.e., that defendant through his agent committed the act or that defendant personally committed it. Either can be proved under an allegation that "defendant" committed the act.' " (*Randle* v. *Cal. State Bd. of Pharmacy* (1966) 240 Cal.App.2d 254, 261 [49 Cal.Rptr. 485, 17 A.L.R.3d 1398], quoting *Cooper* v. *State Board of Equalization* (1955) 137 Cal.App.2d 672, 678 [290 P.2d 914].) By its terms this rule applies when the doctrine of respondeat superior is being used to impose liability on an owner of a business for the acts or omissions of the employees of that owner. ■ Generally in this connection the rule is: "One permitted to maintain and conduct a pharmacy may be disciplined by the pharmacy board for the unlawful acts of his employees while engaged in the conduct and operation of the pharmacy, although the permittee does not authorize the unlawful acts and did not have actual knowledge of the activities." (*Arenstein* v. *California State Bd. of Pharmacy* (1968) 265 Cal.App.2d 179, 192-193 [71 Cal.Rptr. 357].)

■ Such a situation is not involved in the case of Smith, who is merely an employee, albeit the pharmacist-in-charge, of the owner, Roth. Under provisions such as section 4054, a pharmacist-in-charge may have responsibilities similar to those of an owner for the unknown acts of the owner's employees. However, where such a refined statutory theory of responsibility is sought to be imposed on the pharmacist-in-charge, as distinguished from a theory of responsibility for personal commission of the acts charged, fundamental fairness requires notice of the statutory theory in the accusation.

In other words, where liability is sought for the acts of others on the basis of the accused's position as pharmacist-in-charge, we hold due process requires the accusation to "set forth in ordinary and concise language the acts or omissions with which the respondent is charged, to the end that the respondent will be able to prepare his defense [and to] specify the statutes and rules which the respondent is alleged to have violated . . . ." (Gov. Code, § 11503.) As we have seen, the accusation in this case fails to comport with this standard.

Moreover, it is clear that without adequate notice of the charge seeking to fix his responsibility for the acts of others on the basis of his capacity as

pharmacist-in-charge, Smith was left unprepared to contest this theory. As we have seen, Smith argued (and continues to claim) he was prejudiced by his inability to present expert testimony on the appropriate standard of care after having presented testimony he did take some corrective action upon suspecting Roth was engaged in illegality with Stoner. In response, the Attorney General relies on *Banks* v. *Board of Pharmacy* (1984) 161 Cal.App.3d 708, 713 [207 Cal.Rptr. 835], which upheld discipline imposed against a pharmacist-owner because of negligent failure to maintain security based upon a finding the pharmacy's records were inaccurate. The *Banks* case is inapposite.

In *Banks*, an audit of certain controlled substances showed the inventory on hand did not match the records for any of the four drugs surveyed. During the audit period there had been a burglary. However, no inventory was taken to determine if dangerous drugs were taken and, in violation of the California Administrative Code (now the California Code of Regulations), no report was given to the Board concerning any drug loss attributable to the burglary. In addition, it was determined several employees had been stealing the drugs in question. (*Banks* v. *Board of Pharmacy, supra*, 161 Cal.App.3d at p. 711.)

*Banks* did not decide an issue concerning the adequacy of the accusation. Nevertheless, in the context of Banks's argument there was insufficient evidence to support the Board's judgment because there was no evidence to establish duty, i.e., the standard in the community regarding maintaining security and inventory control over the subject controlled substances, the court responded: "A community custom is merely evidence of the standard of care [citation]; the concept has no application to this case. At bench a duty arises from the laws which appellant was found to have violated." (*Banks* v. *Board of Pharmacy, supra*, 161 Cal.App.3d at p. 713.) Under this rule, *Banks* found there was substantial evidence of the pharmacist-owner's negligent failure of security in the form of (a) the outside theft, and (b) the repeated thefts by employees. (*Ibid.*) The court further explained: "The former should have been reported to the Board. Appellant seeks to avoid responsibility for the latter. He may not. ' " "The licensee, if he elects to operate his business through employees must be responsible to the licensing authority for their conduct in the exercise of his license . . . .' By virtue of the ownership of a . . . license such owner has a responsibility to see to it that the license is not used in violation of the law." [Citations.]' [Citation.]" (*Id.* at p. 713.)

Thus, the holding in *Banks* rested on the responsibility of a pharmacy owner for both the acts of the owner's employees and the omissions of the

owner himself in failing to maintain complete and accurate records of dangerous drugs and negligently failing to insure adequate security and inventory control of those drugs. Most important, in *Banks* there was no issue concerning the adequacy of the accusation charging the owner under these theories. Thus, *Banks* is to be distinguished from the present case. Here, as we have seen, the accusation charges Smith as pharmacist-in-charge in terms that reasonably can only be viewed as alleging that Smith, in the words of the Attorney General, "personally" and "volitionally" dispensed the drugs in question to the extent asserted.

The present case is somewhat akin to *McFaddin San Diego 1130, Inc.* v. *Stroh* (1989) 208 Cal.App.3d 1384, 1387, footnote 2 [257 Cal.Rptr. 8], in which we held an accusation stating that the licensee "permitted or suffered" its premises to be used for drug transactions led the licensee to believe its liability was premised on it having "permitted" the drug transactions.[12] The licensee's defense was conducted accordingly. (*Ibid.*) The evidence showed four patrons sold or furnished cocaine to undercover agents on six occasions under circumstances where the licensee's employees were not aware of any of the transactions. We concluded this evidence did not support the charge the licensee "permitted or suffered" the transactions and thus reversed the discipline imposed.

Similar to this case, the ALJ's findings in *McFaddin* expressly eliminated the knowing sales charge. Here, the referee found the "excessive furnishing of drugs was not a result of Smith's intentional course of action but resulted from his extreme neglect of his professional duties." Inasmuch as Smith was charged with personal, volitional dispensing of the drugs, not negligence connected with others who dispensed the drugs, it is appropriate to conclude as in *McFaddin* the matter must be reversed. (See also *Wheeler* v. *State Bd. of Forestry*, *supra*, 144 Cal.App.3d at pp. 526-527, and fns. 2 and 3 [finding of "gross incompetence," never charged in the accusation, was reversed after the licensee was charged with and expressly found not to have committed "deceit, misrepresentation, or fraud in his practice"].)

For the failure to accord Smith adequate due process notice of the charge against him as pharmacist-in-charge, we must reverse the finding Smith's license was subject to discipline for clearly excessive furnishing of controlled substances.

---

[12]The discipline was sought under California constitutional and statutory provisions permitting such action when continuance of the license "would be contrary to public welfare or morals" (Cal. Const., art. XX, § 22; Bus. & Prof. Code, § 24200, subd. (a)) as well as under a section requiring revocation for a licensee's "knowingly" permitting illegal drug sales on licensed premises (§ 24200, subd. (a)). (*McFaddin San Diego 1130, Inc.* v. *Stroh*, *supra*, 208 Cal.App.3d at pp. 1388, 1389, fns. 5, 6.)

## II

In light of the reversal of the excessive furnishing of controlled substances charge, it is not strictly necessary to consider Smith's remaining arguments. However, for guidance we express our view on Smith's contention he could not be found to be within the clearly excessive furnishing of controlled substances provision of section 4350.5, subdivision (e), which makes reference to Health and Safety Code section 11153, subdivision (a). (See fn. 6, *ante*, p. 238.) In the context of the findings made in his case, Smith claims that such a finding is improper unless it is determined that he was, in the language of the Health and Safety Code provision, "the pharmacist who *fills* the prescription," upon whom rests the responsibility for proper dispensing of controlled substances. (Italics added.) Smith argues that this provision does not apply to a set of facts leading to a finding the pharmacist simply "failed to apprise himself of the other's improper dispensing."

While we have no quarrel with Smith's interpretation of the Health and Safety Code provision incorporated into section 4350.5, subdivision (e), we observe in this case the ALJ found that "for each of the prescriptions issued in 1988, Smith was the dispensing pharmacist." This finding, which encompasses the controlled substances prescriptions filled for Stoner, fits within the Health and Safety Code language referring to "the pharmacist who fills the prescription." (See § 4049, defining "dispense" as "the furnishing of drugs or devices upon a prescription from a physician, dentist, podiatrist or veterinarian.") If the evidence supports a similar finding after a rehearing of the excessive furnishing charge, the elements of section 4350.5, subdivision (b), and Health and Safety Code section 11153, subdivision (a), would be fulfilled.

## III

■ Because of its general importance, we also address Smith's argument that because subdivision (d) of section 4350.5 specifies "[g]ross negligence" is a form of unprofessional conduct, then the Legislature could not have contemplated ordinary negligence as an act which would subject a pharmacist to discipline. The gross negligence designation is simply one of several items that are specified as included for purposes of determining what is unprofessional conduct. The list of items expressly "is not limited to" those specified.

Insofar as clearly excessive furnishing of controlled substances is concerned (§ 4350.5, subd. (e)), there is no basis in the statutory language for concluding ordinary negligence could not be the foundation for a determination of unprofessional conduct under this specific provision. (Cf. *Vermont*

*& 110th Medical Arts Pharmacy* v. *Board of Pharmacy* (1981) 125 Cal.App.3d 19, 24-26 [177 Cal.Rptr. 807], where, however, gross negligence was charged under facts showing rather extreme mockery of the law in terms of the obviously bogus nature of the dangerous drug prescriptions filled.) Moreover, as we have seen, *Banks* v. *Board of Pharmacy*, *supra*, 161 Cal.App.3d at page 713, involving inaccurate records because of negligent failure to maintain security, squarely upholds a finding of conduct warranting disciplinary action that is based on ordinary negligence.

Finally, we point out that section 4054's imposition of responsibility on the pharmacist-in-charge for the pharmacy's compliance with laws and regulations, both state and federal, pertaining to the practice of pharmacy, contains no exclusion for negligent conduct. We conclude that under appropriate charges a licensee properly may be disciplined on the basis of ordinary negligence.

## IV

In light of our holding that principles of due process require overturning the Board's finding Smith's license is subject to discipline for unprofessional conduct based on clearly excessive furnishing of controlled substances under section 4350.5, subdivision (e), we do not address Smith's remaining issue attacking the penalty of license revocation as excessive. Smith's penalty requires redetermination at the conclusion of further proceedings. Such a redetermination, of course, will also take into account the unchallenged findings Smith's license is subject to discipline for unprofessional conduct (a) pursuant to section 4350.5, subdivision (c), for deceit and dishonesty in removing and keeping pharmacy records, and (b) pursuant to section 4350.5, for violation of sections 4232 and 4331, failure to preserve prescriptions filled for three years.

## DISPOSITION

The judgment is reversed and the superior court is directed to issue a writ of mandate compelling the Board to vacate its decision and conduct further proceedings consistent with the views expressed in this opinion.

Work, Acting P. J., and Froehlich, J., concurred.