JUSTICE TRIEWEILER
dissenting.
¶125 I dissent from the majority’s findings and conclusions that Justice of the Peace Michael S. Smartt violated Canons of Judicial Ethics and from the majority’s decision to discipline Smartt by suspending him from his position without pay during the remainder of his term in office.
¶126 After all the pious outrage shown by everyone involved in this case, including Justice of the Peace Samuel Harris, the Judicial Standards Commission and the majority of this Court, the facts are that Michael S. Smartt is being removed from the position to which he was elected for conduct committed in private which had absolutely no effect on his job or anyone else. After all evidence which was illegally gathered is excluded, the incredible testimony of Troy Dye disregarded, and the Court’s consideration limited to those allegations which were actually charged in the complaint filed against Smartt, Smartt has been removed from his position without pay because two co-workers discovered that he had viewed three sexually explicit photos on a county-owned computer, in the privacy of his office. The majority and concurring opinions demonstrate far greater concern for the majority’s sense of good taste than for the constitutional right of privacy. The result in this case reflects more poorly on Smartt’s accusers than on Smartt.
CONDUCT OF SAMUEL HARRIS
¶127 With all the complaining that has gone on in recent years about judicial case loads, I assumed that members of the judiciary had better things to do than repeatedly and illegally sneak into another judge’s office, pry into the hard drive of his computer, and when something offensive to others is discovered, spend the resources we have spent investigating him, trying him, publicly humiliating him and his family and taking away the source of his livelihood. It would be different if Smartt was the one who had violated another coworker’s constitutional rights by invading his privacy, as Harris did, but Smartt 1) violated no laws; 2) violated no county policies; 3) did not *535 intentionally impose his bad taste on anyone else; 4) was not found to have neglected his duties; and 5) was not shown to have cost his employer one extra cent because of his personal and private viewing habits.
¶128 Nevertheless, Smartt has been reported by Harris to the FBI, investigated by the Department of Justice, sexual harassment charges have been filed against him, he has had to defend himself before the Judicial Standards Commission, and he has now been suspended from his employment without pay. The resources that have been wasted following the inadvertent discovery of one sexually explicit computer screen is more befitting the Salem witch hunts than a busy judiciary with any sense of priorities. (The majority’s protestations to the contrary notwithstanding.)
¶129 Cascade County Commissioner, Tom Stelling, testified that there had been a history of poor relations between Harris and Smartt prior to the events which have led to Smartt’s discipline. My impression from a review of the entire record is that because of that poor relationship, Harris embarked on a personal crusade to destroy Smartt after viewing the sexually explicit photos which were so upsetting to him that he printed them, took them home with him, and then snuck back into Smartt’s office repeatedly with a digital camera to see what else he could find. Am I missing something or has the wrong justice of the peace been sanctioned? On a scale of disgusting and deplorable conduct, I would have to rank the gross and repeated invasion of Smartt’s privacy by his co-worker far worse and, if unpunished, of greater consequence to society and the judiciary than anything that Smartt was actually found to have done.
¶130 If the public confidence in the judiciary is the Court’s concern, it will be interesting to see what discipline is imposed on Harris who is actually responsible for the negative public perception the Court is so concerned about by invading Smartt’s right to privacy in violation of the law and then using the fruits of his illegal search to advise the public that a fellow justice spent his private time in a manner that Harris knew would be offensive to large numbers of people.
CONSTITUTIONAL ISSUES
¶131 One of the worst failures of the majority Opinion is its avoidance of the serious constitutional issues on appeal regarding a judge’s, or any other public official’s, right to privacy in his office and the content of his or her private communications or observations. I conclude that pursuant to Article II, Sections 10 and 11 of the Montana Constitution, Smartt did have a reasonable expectation of privacy in his office and in the contents of his computer; that Harris, as a public *536 official, violated that right to privacy when he repeatedly and surreptitiously entered Smartt’s chambers without a search warrant and without Smartt’s permission; and, that all fruits of Harris’s search should have been suppressed by the Judicial Standards Commission and disregarded by this Court.
¶132 The majority has correctly noted in ¶ 63 and ¶ 64 of its Opinion that whether there is an unlawful government intrusion into one’s privacy depends on 1) whether the person has an actual expectation of privacy; 2) whether society is willing to recognize that expectation as objectively reasonable; and 3) the nature of the State’s intrusion. Here, Smartt testified that he had a personal expectation of privacy in not only his office but in the contents of the hard drive of his computer. Although the computer system in his office was networked, other employees at the County did not have access to the information contained on his hard drive without entering his office, turning on his computer, entering his password, and performing the functions necessary to access that information. Tom Stelling, the only county commissioner who testified, stated that he believed justice of the peace chambers were private and that the only appropriate way for a person other than the user of a computer to access information on the computer is to bring a problem to the attention of the county commissioners and then notify the user about the need to gain access. There is no real dispute that the first element necessary for finding a right to privacy exists in this case.
¶133 I believe that society recognizes as reasonable the expectation of judges or other public officials to privacy in the contents of their office, including information stored on their computers. The information found on the hard drive of Smartt’s computer is no different than the contents of his desk drawers, his brief case, or sealed envelopes sitting on top of his desk. His computer includes rough drafts of orders and sensitive search warrant information-the disclosure of which could cause harm to others. No reasonable person would expect that a fellow employee could walk into Smartt’s office, rifle through his desk drawers, open his mail, or search his brief case. Why would they feel any differently about information stored on his computer hard drive? Not only would society be willing to recognize Smartt’s expectation of privacy as reasonable, most members of the public would be shocked that Harris so cavalierly disregarded Smartt’s expectation of privacy. It is ironic that while this Court discusses and votes on public issues privately and goes to great lengths to shred and conceal copies of proposed documents, it is not willing to extend the same degree of privacy to a justice of the peace. If this Court is as concerned as it indicates about erosion of public confidence in the *537 judiciary, it does not have to look further than this apparent double standard for cause.
¶134 Finally, it is necessary to consider the nature of the State’s intrusion. I agree that the initial efforts to shut down Smartt’s computer which led to the inadvertent display of a screen depicting sexually explicit photographs was not a search and, therefore, not an intrusion which violated Smartt’s right to privacy. However, Harris’s conduct was something else. Although he feigned offense at the images that appeared unexpectedly, he took the time to print the images and take them home with him. He returned to the office the following day (a Sunday) and accessed the short term history file on Smartt’s Internet Explorer and hand recorded all the web sites that had been visited within the previous twenty days. He returned to Smartt’s office three to four times on the following Monday and three to four times on the following Tuesday. During those visits, he took digital photos of the web sites that had been visited by Smartt until he ran out of digital capacity. He did not have permission to enter Smartt’s chambers. He did not ask for permission from the county commissioners. He did not ask for the assistance of law enforcement officials. And, he was not protecting other employees because other than Stevenson’s inadvertent discovery, no other employees had been affected by Smartt’s use of his computer. Following these exhaustive efforts to discover what was on Smartt’s computer, Harris filed a complaint alleging that Smartt sexually harassed him for having the material that Harris observed on his computer. Go figure.
¶135 Even Stevenson would not have been affected by Smartt’s use of his computer had she not first activated the screen, made the necessary adjustment to exit Word Perfect, and then clicked on an icon on the tool bar which opened the program which displayed the sexually explicit photos. Contrary to the findings of the commission, her discovery was much different than had Smartt left an open magazine on his desk displaying sexually explicit material.
¶136 It doesn’t matter that Smartt’s computer was in a public office. The U.S. Supreme Court has held that workers may have a legitimate expectation of privacy in their offices or in parts of their offices such as their desks or file cabinets. See O’Conner v. Ortega (1987), 480 U.S. 709, 716-18, 107 S.Ct. 1492, 1497-98, 94 L.Ed.2d 714, 722-23. The Supreme Court did say in O’Conner that public employers have some latitude to enter the offices of employees for work-related, non-investigatory reasons. However, Harris was not Smartt’s employer. Therefore, even if this Court was to consider the exception in Harris, when interpreting the greater protections provided for in Article II, Sections 10 and 11 of the Montana Constitution, the exception would *538 be inapplicable. Furthermore, it is irrelevant that Harris was a justice of the peace rather than a police officer. The U.S. Supreme Court has never limited the Fourth Amendment’s protection to searches and seizures conducted by the police and neither should we when interpreting our own constitution. In New Jersey v. T.L.O. (1985), 469 U.S. 325, 336, 105 S.Ct. 733, 739, 83 L.Ed.2d 720, 730-31, the Court stated:
It may well be true that the evil toward which the Fourth Amendment was primarily directed was the resurrection of the pre-Revolutionary practice of using general warrants or “writs of assistance” to authorize searches for contraband by officers of the Crown. See United States v. Chadwick, 433 U.S. 1, 7-8, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); Boyd v. United States, 116 U.S. 616, 624-629, 6 S.Ct. 524, 29 L.Ed. 746 (1886). But this Court has never limited the Amendment’s prohibition on unreasonable searches and seizures to operations conducted by the police. Rather, the Court has long spoken of the Fourth Amendment’s strictures as restraints imposed upon “governmental action”-that is, “upon the activities of sovereign authority.” Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). Accordingly, we have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities: building inspectors, see Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), Occupational Safety and Health Act inspectors, see Marshall v. Barlow’s, Inc., 436 U.S. 307, 312-313, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), and even firemen entering privately owned premises to battle a fire, see Michigan v. Tyler, 436 U.S. 499, 506, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), are all subject to the restraints imposed by the Fourth Amendment. As we observed in Camara v. Municipal Court, supra, “[the] basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.” 387 U.S., at 528, 87 S.Ct. 1727. Because the individual’s interest in privacy and personal security “suffers whether the government’s motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards,” Marshall v. Barlow’s, Inc., supra at 312-313, it would be “anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.” Camara v. Municipal Court, supra at 530.
¶137 Finally, I would hold that evidence seized in violation of the *539 Constitution cannot be used at disciplinary proceedings before the Judicial Standards Commission, the Supreme Court, the Commission on Practice or any other disciplinary agency which has the authority to deny an individual his license to practice his profession or otherwise prohibit him or her from engaging in that profession. When confronted with the same issue, in Ira re Langley (Or. 1962), 370 P.2d 228, 230, the Oregon Supreme Court held that:
[W]e hold that it would not be desirable for the Bar to employ in its disciplinary operations illegal tape recordings, evidence secured unlawfully by wire-tapping, or other fruits of criminal eavesdropping. We recognize that the rules of evidence in disciplinary cases are more flexible than they are in criminal prosecutions. However, to permit the Bar to use illegal tape recordings would be inconsistent with the public policy expressed by ORS 165.540.
¶138 At least one California decision applies the exclusionary rule to forfeiture proceedings which are civil in nature. In Elder v. Board of Medical Examiners of the State of California (Ct.App., 1st App.Dist., 1966), 241 Cal.App.2d 246, 260, 50 Cal.Rptr. 304, 315, the Court of Appeals held that:
Whatever the label which may be attached to the proceeding, it is apparent that the purpose of the forfeiture is deterrent in nature and that there is a close identity to the aims and objectives of criminal law enforcement. On policy the same exclusionary rules should apply to improper state conduct whether the proceeding contemplates the deprivation of one’s liberty or property. [Citations omitted.]
¶139 Likewise, admitting illegally gathered evidence at a disciplinary proceeding is inconsistent with the public policy for the exclusionary rule. The purpose of the exclusionary rule is to deter the violation of constitutional rights. See Elkins v. U.S., (1960), 364 U.S. 206, 217-24, 80 S.Ct. 1437, 1444-47, 4 L.Ed.2d 1669, 1677-80. Deterrence is no less important because rights have been violated by a justice of the peace. And, constitutional rights are no less significant because invoked in disciplinary proceedings than if they had been invoked in a criminal proceeding. By avoiding the issues of whether Smartt’s right to privacy was violated and whether the evidence seized as a result of that violation should have been excluded from consideration by the Judicial Standards Commission and this Court, the Court has shirked its responsibility to protect not just the rights of Smartt but has provided no protection to the other members of the judiciary and public employees who may in the future, for lack of guidance, lose their privacy to snooping co-workers with an ax to grind. *540 Given the current political climate and conditions under which public employees work, it is already a challenge to maintain morale. Not knowing whether public employees have a right to privacy in personal records kept at their offices or personal communications can only make things worse. After all, if a co-worker can explore the communications and data on a co-worker’s computer, is listening in on co-worker phone conversations far behind? I see no valid distinction.
VIOLATION OF CANONS
¶140 The majority bases its conclusion that Smartt violated Canons of Judicial Ethics on its findings that 1) Smartt accessed sexually explicit images and exposed co-workers to those images; and that 2) he entered the residence of Troy Dye without permission and gave Dye inappropriate advice.
¶141 The problem with the first basis is that while Smartt admittedly accessed sexually explicit images, he did so in the privacy of his office and did not intentionally expose anyone to those images. They were discovered by varying degrees of effort on the part of his coworkers and it was never Smartt’s intention that they be discovered. He broke no laws; he violated no policies; he caused the government no expense; and there is no evidence that his activities affected the performance of his job. Furthermore, nothing he did in private undermined or in any way affected public confidence in the judiciary.
¶142 The problem with disciplining Smartt for giving Dye inappropriate advice is that he was never charged with doing so in the complaint filed before the Judicial Standards Commission. This Court has sua sponte latched onto testimony given by Dye during cross-examination and explained by Smartt during his testimony and created a basis for discipline about which Smartt was given no notice and against which he was never given an opportunity to defend. The actual charge against Smartt in relation to Dye was that based on statements made by Dye, Smartt smoked marijuana with him, propositioned him, sexually assaulted him, and entered his home for the purpose of committing a crime. However, the Commission members found that none of Dye’s allegations had been proven by clear and convincing evidence and, in fact, found that Dye had little credibility. There was good reason for disregarding Dye’s testimony. He had given at least six different statements to six different people; he had at one time or another gone by three different aliases; he had been charged with criminal offenses fifteen to twenty times in the previous ten years, including crimes of dishonesty and violence; and, after investigating Dye’s allegations, Rick Lueck from the State Department of Justice found that Dye’s version of events was so *541 inconsistent with what he had told other people that he did not know which version to rely on. When the majority state, as they do in ¶ 82, that their decision is in part based on the testimony of Troy Dye, they as much as concede that their decision is not well founded.
¶143 The majority and concurring Opinions find that Smartt has brought disrepute on the judiciary and that nothing short of his termination without pay will restore public faith and trust. The majority’s conclusion is misguided in several respects. First, it is not Smartt who caused public disrespect for the judiciary. What Smartt did was done behind closed doors in the privacy of his own office. No one else was affected and until it was exposed by his snooping coworker, the public knew nothing about it. Now, as a result of Samuel Harris’s efforts, Smartt has been investigated by the FBI for allegedly viewing child pornography, investigated by the Cascade County Attorney for allegations of sexual harassment, and investigated by the Department of Justice for sexual assault. Following these investigations, none of the allegations were found to be a basis for prosecuting or disciplining Smartt. However, as a result of the investigations and the attendant publicity, Smartt and his family have been humiliated and the judiciary made to look foolish.
¶144 The majority’s conclusion that Smartt’s prior conduct diminishes the high esteem in which the judiciary is held shows a certain detachment from reality. Only judges and a few members of the bar are so deluded that they think the public expects more of them in the conduct of their personal lives than they expect of other people. The public is way ahead of the judiciary. They know that people elected or appointed to the bench have the same faults, weaknesses and biases as everyone else. All the public hopes for is the fair treatment which was denied in this case. This case is just the most recent example of a judiciary taking itself too seriously.
DISCIPLINE
¶145 If we are going to start terminating public officials because they use their computers to do something unrelated to their official duties, where will we draw the line? Is this simply going to be the sexual material rule or is this decision going to apply to every use of a computer by a public official which is not directly related to governmental business? If the rule is limited to sexual material, then how offensive does the sexual material have to be and who is going to make that determination? If it is not simply the sexual nature of the material that is at issue, then only those members of the Judicial Standards Commission and this Court who have never used their state or county-owned computer to visit internet sites which are not work *542 related, should participate in this decision. In fact, everyone who voted to take Smartt’s job away should make his or her own hard drive available for unannounced public inspection. Otherwise, there is a certain ring of hypocrisy to this whole result.
¶146 There are a number of circumstances under which I would consider it appropriate to discipline Smartt. For example, if he had:
1. Used government phones at taxpayer expense to make long distance calls to raise hundreds of thousands of slush fund money to be used for partisan purposes; or
2. Obstructed investigation of a staff member for something as serious as negligent homicide; or
3. Received property for a fraction of its actual value from a large corporation with a case before his court; or
4. Flagrantly violated a fellow co-worker’s constitutional rights, such as the right to privacy;
then, I would conclude that discipline is appropriate. However, in this case, Smartt’s conduct, until he was investigated and prosecuted, did not cost the taxpayers a cent. After thorough investigation, it was concluded that he had not violated any laws and had not sexually harassed anyone in the work place. He did not knowingly expose anyone else to offensive material and there has been no evidence presented in this case that how he spent private time in his chambers in anyway compromised his performance of his job. This Opinion strikingly illustrates the blatant hypocrisy in government which is, after all, the greatest cause of public contempt for and distrust of government. Therefore, if the majority’s purpose is to restore public confidence, this decision is a misguided effort.
¶147 Smartt simply viewed material in the privacy of his office which most people consider offensive. For that, his job has been taken away. God protect us from the wrath of the righteous.